# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

PETIPREN v JASKOWSKI
JASKOWSKI v PETIPREN

Docket Nos. 144142 and 144143. Argued November 14, 2012 (Calendar No. 6). Decided June 20, 2013.

Thomas J. Petipren brought an action in the Sanilac Circuit Court against Rodney Jaskowski, who was the police chief for the village of Port Sanilac, and the village of Port Sanilac, alleging that Jaskowski had assaulted and wrongfully arrested him for resisting and obstructing and disorderly conduct (Docket No. 144142). Jaskowski filed a separate suit against Petipren, alleging assault and negligent and intentional infliction of emotional distress. Petipren filed a counterclaim in the separate lawsuit, alleging claims of negligence, negligent infliction of emotional distress and intentional infliction of emotional distress against Jaskowski (Docket No. 144143). Petipren's band had been scheduled to perform at a fundraiser hosted by the village of Port Sanilac. Attendees complained about the style of music that was being performed before Petipren's performance. Jaskowski was called to the event, and a decision was made to stop the bands' performances. Petipren, who claimed that he was unaware of the decision to stop the performances, was warming up on his drum set when Jaskowski approached him. Jaskowski proceeded to arrest Petipren, but the parties' respective versions of the circumstances surrounding the arrest were completely different. Petipren alleged that he did not resist arrest, but that Jaskowski barged through the drum set and then pushed him off his seat and into a pole before pushing him off the stage and onto the grass where he was handcuffed. Jaskowski alleged that Petipren refused to stop playing, swore at him, struck him in the jaw, and then resisted arrest. Jaskowski filed motions for summary disposition pursuant to MCR 2.116(C)(7) in both cases on the basis that under MCL 691.1407(5), Petipren's claims were barred by governmental immunity. The court, Donald A. Teeple, J., denied Jaskowski's motions. Jaskowski appealed both orders and the Court of Appeals consolidated the appeals. The Court of Appeals, FITZGERALD and RONAYNE KRAUSE, JJ. (MURRAY, P.J., dissenting), affirmed. 294 Mich App 419 (2011). The Supreme Court granted leave to appeal. 491 Mich 913 (2012).

In an opinion by Justice KELLY, joined by Chief Justice YOUNG and Justice ZAHRA, the Supreme Court *held*:

As used in MCL 691.1407(5), the term "executive authority" encompasses all authority vested in the highest executive official of a level of government by virtue of his or her role in the executive branch, including the authority to engage in tasks that might also be performed by

lower-level employees. Thus, the highest executive official of a level of government is entitled to absolute immunity under MCL 691.1407(5) even when performing acts that might otherwise be performed by a lower-level employee if those acts fall within the authority vested in the official by virtue of his or her role as an executive official.

1. Under MCL 691.1407(5), a judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority. To qualify for absolute immunity under the statute, the governmental employee must establish (1) the he or she is a judge, legislator, or the elective or highest appointive executive official of a level of government and (2) that he or she acted within the scope of his or her judicial, legislative, or executive authority. In context, the words "executive authority" appear as a counterpart to the statute's reference to judicial and legislative authority, thereby referring to the division of power among the three branches of government. Thus, "executive authority" means all authority vested in the highest executive official of a level of government by virtue of his or her position in the executive branch. In arguing that the immunity provided for in the statute is limited to a specific subset of authority, the dissent departed from the statutory language, isolating the term "executive authority" from its context. The official's scope of authority is the extent or range of his or her delegated executive power. Although lower-level employees and high-ranking officials may possess some overlapping authority and engage in the same governmental conduct, the statute includes no indication that the immunity granted to high-ranking officials is not absolute when the official's authority encompasses conduct that might also be performed by a lower-level employee. An objective inquiry into the factual context is necessary to determine the scope of the actor's executive authority. Factors to consider include the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government. The inquiry does not include analysis of the actor's subjective state of mind.

2. In this case, Jaskowski had the statutory authority to conduct an arrest and his job duties included arresting offenders. There was no genuine issue of material fact with regard to whether Jaskowski possessed the authority to conduct an arrest. When the highest appointive executive official of a level of government acts within the authority vested in the official by virtue of his or her executive position and there are no questions of material fact, the official is entitled to absolute immunity as a matter of law. The circuit court erred when it denied Jaskowski's motions for summary disposition because it believed that Jaskowski had acted out of personal animus. The actor's intent has no bearing on the scope of his or her executive authority. The Court of Appeals erred when it construed the term "executive authority" as including only high-level tasks exclusive to an executive's position. Because the power to arrest fell within the scope of Jaskowski's executive authority, he was absolutely immune from tort liability stemming from Petipren's arrest, and the lower courts erred by denying Jaskowski's motions for summary disposition.

Reversed and remanded for entry of judgment in favor of Jaskowski in Docket No. 144142, for entry of judgment in favor of Jaskowski on Petipren's counterclaims in Docket No. 144143, and for further proceedings consistent with the Court's opinion.

Justice CAVANAGH, joined by Justice MARKMAN, dissenting, would have held that the word "executive" within the phrase "executive authority" refers to a specific subset of authority that a high-level executive must be acting within the scope of to obtain the benefit of absolute immunity from tort liability under MCL 691.1407(5). The majority's interpretation erroneously construed the phrase "executive authority" as coextensive with the phrase "executive branch." In doing so, it failed to give effect to every word in the statute and broadened the scope of absolute immunity beyond the intent of the Legislature. With regard to this case, a chief of police is not entitled to absolute immunity simply because, as a police officer, the chief has the authority to arrest. In carrying out the decision to arrest, Jaskowski was not acting within the scope of his executive authority as the highest appointive executive official of a level of government. Instead he was acting within his authority as an ordinary police officer. Accordingly, Jaskowski was only entitled to seek qualified immunity under MCL 691.1407(2) and *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567 (1984).

Justices MCCORMACK and VIVIANO took no part in the decision of this case.

©2013 State of Michigan

# Opinion

Chief Justice:          Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED JUNE 20, 2013

S T A T E   O F   M I C H I G A N

SUPREME COURT

THOMAS J. PETIPREN,

        Plaintiff-Appellee,

v                          No. 144142

RODNEY JASKOWSKI,

        Defendant-Appellant,

and

VILLAGE OF PORT SANILAC,

        Defendant.

RODNEY JASKOWSKI,

        Plaintiff/Counterdefendant-
        Appellant,

v                          No. 144143

THOMAS J. PETIPREN,

        Defendant/Counterplaintiff-
        Appellee.

BEFORE THE ENTIRE BENCH (except MCCORMACK and VIVIANO, JJ.)

MARY BETH KELLY, J.

This case concerns "absolute" governmental immunity. Specifically, we consider whether a village chief of police, the highest appointive executive official of a level of government, acted within the scope of his "executive authority" when he performed the duties of an ordinary police officer and is, therefore, entitled to absolute immunity under MCL 691.1407(5) of the governmental tort liability act (GTLA), MCL 691.1401 *et seq*. We hold that the term "executive authority," as used in MCL 691.1407(5), encompasses *all* authority vested in the highest executive official by virtue of his or her role in the executive branch, including the authority to engage in tasks that might also be performed by lower-level employees. Consistent with the plain meaning of "executive authority," the highest executive official is entitled to absolute immunity under MCL 691.1407(5) even when performing acts that might otherwise be performed by a lower-level employee if those actions fall within the authority vested in the official by virtue of his or her role as an executive official. Because no factual dispute exists in this case with regard to whether the village chief of police had the authority to conduct an arrest in his official capacity as chief of police, we hold that the chief of police is absolutely immune from tort liability arising from his arrest of the citizen in this case. The Court of Appeals reached a contrary conclusion and, accordingly, we reverse the judgment of the Court of Appeals and remand this matter to the circuit court for entry of summary disposition in favor of village of Port Sanilac Chief of Police Rodney Jaskowski with regard to the claims against him and for further proceedings not inconsistent with this opinion.

2

## I. FACTS AND PROCEDURAL HISTORY

On July 19, 2008, the village of Port Sanilac held its annual "Bark Shanty Festival," an outdoor summer fundraising event involving a beer tent and several musical acts. The band HI8US was among the acts scheduled to perform. Before HI8US's scheduled performance, volunteers working at the beer tent received numerous complaints about the allegedly offensive music. Ron Smith, the Brown City Police Chief, reported to the park after volunteers at the beer tent relayed to him the complaints about the offensive music. The organizer of the musical portion of the event also returned to the park after receiving a call informing her that festival patrons were displeased with the music.

When Smith arrived at the park, he heard individuals in the beer tent heckling the band then onstage. He also saw attendees, including families, leaving the festival, some of whom voiced their displeasure with the musical performances as they left. Several individuals also complained to Smith that they found the bands' music "offensive, disturbing, and not appropriate for the crowd." The Village of Port Sanilac Fire Chief, who was involved with beer tent operations, indicated he would close the beer tent if the bands' music continued to drive patrons away. He also warned Smith that he anticipated trouble arising between the bands' supporters and other festival attendees. Concerned about the festival's atmosphere, Smith contacted Jaskowski to report the potential trouble. After speaking with Smith, Jaskowski went to the park and agreed with the decision to stop the bands' performances.

3

Thomas Petipren, a drummer for HI8US, claims that he did not know that organizers decided to cancel the remaining musical performances and was onstage playing his normal warm-up routine when Jaskowski approached him. Petipren noticed Jaskowski appeared angry, so he stopped playing and held his drumsticks in his lap. He claimed he said nothing and simply waited to find out what Jaskowski wanted. Jaskowski then allegedly knocked over Petipren's equipment, grabbed and threw Petipren's drumsticks to the ground, and assaulted him, grabbing Petipren by the collar and pushing him off his seat and into a pole. Petipren claims he put his arms up and asked, "What did I do?" Jaskowski then allegedly pushed him off the stage and down onto the grass, yelling at Petipren to stop resisting. Once Petipren was face down, Jaskowski handcuffed him. When a bystander asked why Petipren was being arrested, Jaskowski had him arrested as well.

In contrast to Petipren's version of events, Jaskowski insists that he told Petipren to stop playing, to which Petipren responded by swearing at him and punching him in the jaw. Jaskowski then arrested Petipren. Jaskowski maintains that Petipren continued to resist while he was placed in handcuffs. Jaskowski arrested Petipren for resisting and obstructing a police officer, assaulting a police officer, and disorderly conduct, but the prosecutor ultimately declined to press any charges.

Following the incident, Petipren filed suit against the village of Port Sanilac[1] and Jaskowski, individually and in his capacity as the chief of police.[2] Petipren alleged

---

[1] The circuit court dismissed the claims against the village after determining that the village was immune from liability under MCL 691.1407(1), which provides immunity to governmental agencies engaged in governmental functions.

assault and battery and false arrest. Several months later, Jaskowski filed a separate suit against Petipren, claiming assault and battery, intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress.[3] Petipren, in turn, counterclaimed against Jaskowski, alleging intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress.

Jaskowski moved for summary disposition under MCR 2.116(C)(7) in Petipren's original suit, and, at a later date, under MCR 2.116(C)(7), (8), and (10) in regard to Petipren's counterclaims. In both cases, Jaskowski asserted that he was absolutely immune under MCL 691.1407(5) of the GTLA because, in executing the arrest, he acted within his executive authority as the highest appointed executive official of a level of government.[4] To establish his claim, Jaskowski provided the circuit court with the job description for the village of Port Sanilac chief of police and an affidavit in which he attested to his occupational duties. The job description includes a list of "ESSENTIAL DUTIES AND RESPONSIBILITIES" and identifies the "FUNCTIONAL

---

[2] Sanilac Circuit Court Docket No. 09-032990-NO.

[3] Sanilac Circuit Court Docket No. 10-033374-NO.

[4] In regard to Petipren's negligence-based counterclaims, Jaskowski also asserted that he was entitled to the governmental immunity available to all officers and employees of governmental agencies under MCL 691.1407(2) because Petipren failed to allege gross negligence. See *Odom v Wayne Co*, 482 Mich 459, 479-480; 760 NW2d 217 (2008). Relying on *Odom*, Jaskowski also maintained that Petipren's intentional-infliction-of-emotional-distress counterclaim must be dismissed because Jaskowski had acted in good faith, he acted or reasonably believed he was acting within the scope of his authority, and the arrest was discretionary in nature, thereby entitling him to the immunity available to lower-level employees under MCL 691.1407(2).

RESPONSIBILITIES" of the police department, the latter of which include "[m]aintenance of law and order in the Village of Port Sanilac" and "[t]he enforcement of all laws of the United States, the State of Michigan, and all ordinance of such law, and ordinances of the Village of Port Sanilac."[5] The functional responsibilities identified in the job description also included

> [p]atrol[ing] the streets of the Village of Port Sanilac, . . . and in doing so observ[ing] and investigat[ing] persons, situations or things which require attention and which affect enforcement of laws or prevention of crime. Preserv[ing] the peace and protect[ing] life and property, control[ing] public gatherings and perform[ing] miscellaneous services relative to public health and safety including property checks . . . . Receiv[ing] and process[ing] complaints by citizens, arrest[ing] offenders, prepar[ing] reports and testify[ing] in court.[6]

Petipren opposed the motions for summary disposition, arguing that Jaskowski was *not* the highest executive of a level of government and that Jaskowski had acted with an improper motive, arresting Petipren because Jaskowski was prejudiced against Petipren and his fans. The circuit court denied Jaskowski's motion for summary disposition in Petipren's original suit, concluding that because Jaskowski had acted with a biased motive, he had not acted within his executive authority as chief of police. On the record, the circuit court explained, "I don't think it's acting in a Governmental function, I don't think it's within the scope of authority of a Police Chief. I think it's a personal vendetta, someone who thinks there's a Music Fair apparently and therefore immunity is not

---

[5] Emphasis omitted.

[6] The job description's essential duties and responsibilities involve employment decisions, administrative tasks, policy and procedural decisions, and the general authority to "[m]ake[] decisions and take[] necessary actions."

6

available to Rodney Jaskowski. That motion is denied." The circuit court also denied Jaskowski's claim of absolute immunity in regard to Petipren's counterclaims in the second lawsuit.[7]

Jaskowski appealed each case as of right, disputing the circuit court's application of governmental immunity. The Court of Appeals consolidated the appeals and, in a split, published opinion, affirmed, holding that "[w]hen a police chief acts as an ordinary police officer—that is, when the nature of the act is outside the scope of his or her *executive duties*—the chief is not entitled to absolute immunity simply because he or she is also the police chief."[8] After noting that no binding Michigan case had considered whether a police chief is entitled to absolute immunity when he or she undertakes actions performed by ordinary police officers, the Court of Appeals construed the words "executive authority," as used in MCL 691.1407(5), to mean only those "'tasks particular to [the official's] position as the "highest appointive official."'"[9] According to the Court

---

[7] The circuit court likewise declined to dismiss Petipren's intentional-infliction-of-emotional-distress counterclaim under MCR 2.116(C)(10), finding an issue of fact remained concerning whether Jaskowski's conduct could be characterized as "extreme and outrageous" and whether he acted in good faith as required by *Odom*. The circuit court dismissed Petipren's negligence and negligent-infliction-of-emotional-distress counterclaims under MCR 2.116(C)(8), but it allowed Petipren to amend his countercomplaint to state a claim of gross negligence, which he did. As a result, the remaining claims to be resolved include Petipren's claims of assault and battery and false arrest and his counterclaims for intentional infliction of emotional distress and gross negligence.

[8] *Petipren v Jaskowski*, 294 Mich App 419, 432; 812 NW2d 17 (2011) (emphasis added).

[9] *Id*. at 431, quoting *Scozzari v City of Clare*, 723 F Supp 2d 945, 967 (ED Mich, 2010). In adopting *Scozzari*'s interpretation of "executive authority," the Court of Appeals rejected the reasoning of an unpublished Court of Appeals opinion, which held that "a police chief's 'executive authority' includes his duties as a high ranking executive as well

of Appeals, this interpretation, which it adopted from a federal district court decision, "best reflects the legislative intent expressed in the words of [the statute]."[10] The Court of Appeals explained:

> Although a police chief may occasionally perform the duties of an ordinary police officer, the police chief is not acting within the scope of his or her *executive* authority as the highest executive official in the police department when doing so. Rather, the nature of the act is that of an ordinary police officer. As an ordinary police officer, he would be entitled to the immunity provided to governmental employees under MCL 691.1407(2) if all the statutory requirements were satisfied. Indeed, it would lead to an illogical result to limit a plaintiff's intentional-tort claims arising from the conduct of a police officer in those cases in which the police officer was also the police chief who was acting as an ordinary police officer at the time he or she allegedly committed the tortious act.[11]

Given its understanding of the term "executive authority," the Court of Appeals applied the factors relevant to determining the scope of the actor's executive authority, articulated by this Court in *American Transmissions*, *Inc v Attorney General*,[12] by considering only that evidence related to Jaskowski's high-level duties, as outlined in the essential-duties

---

as his ordinary duties as a police officer." *Lewkowicz v Poe*, unpublished opinion per curiam of the Court of Appeals, issued May 15, 2001 (Docket No. 216307), p 2. The panel of the Court of Appeals addressing this case determined that *Lewkowicz* was unpersuasive given that, in *Lewkowicz*, the police chief was directed to attend a city council meeting "in his official capacity as police chief . . . ." *Petipren*, 294 Mich App at 431 (emphasis omitted).

[10] *Id.*

[11] *Id.* at 432-433.

[12] *American Transmissions, Inc v Attorney General*, 454 Mich 135, 141; 560 NW2d 50 (1997), quoting *Marrocco v Randlett*, 431 Mich 700, 710-711; 433 NW2d 68 (1988).

section of the police chief's job description.[13] Because those duties "generally involve policy, procedure, administration, and personnel matters," the Court of Appeals concluded that Jaskowski was not acting within his executive authority when he arrested Petipren and that Jaskowski was, therefore, not entitled to absolute immunity under MCL 691.1407(5).[14]

We granted leave to appeal, "limited to the issue whether Chief of Police Jaskowski is entitled to absolute immunity under MCL 691.1407(5)."[15]

## II. STANDARD OF REVIEW

This Court reviews de novo a circuit court's decision regarding a motion for summary disposition.[16] When a claim is barred by governmental immunity, summary disposition is appropriate under MCR 2.116(C)(7).[17] Under MCR 2.116(C)(7), the moving party has the option of supporting its motion with affidavits, depositions,

---

[13] *Petipren*, 294 Mich App at 427-429. The Court of Appeals recognized that the job description also included a section setting forth the functional responsibilities of the police department, which are equivalent to the duties of an ordinary police officer, and that Jaskowski submitted an affidavit stating that his duties included those functional responsibilities. However, the Court of Appeals dismissed the significance of this evidence because "the fact that Jaskowski performed those functions does not place the functions within the scope of the *executive* duty of the police chief; rather, they remain within the scope of the functional responsibilities of the police department generally." *Id.* at 432 n 6.

[14] *Id.* at 429, 432-433.

[15] *Petipren v Jaskowski*, 491 Mich 913 (2012).

[16] *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

[17] *Glancy v City of Roseville*, 457 Mich 580, 583; 577 NW2d 897 (1998).

9

admissions, or other documentary evidence provided that the "substance or content" of the supporting proofs is admissible as evidence.[18] In reviewing a motion under MCR 2.116(C)(7), we accept the factual contents of the complaint as true unless contradicted by the movant's documentation.[19] When the material facts are not in dispute, this Court may decide whether a plaintiff's claim is barred by immunity as a matter of law.[20]

This case requires us to interpret MCL 691.1407(5), raising an issue of statutory interpretation that this Court reviews de novo.[21] When construing a statute, this Court's obligation is to discern the Legislature's intent as expressed in the statute's plain language.[22] If the language is clear and unambiguous, the statute must be enforced as written without judicial construction.[23]

## III. ANALYSIS

Before the Michigan Legislature's enactment of the GTLA, this Court's jurisprudence recognized the existence of governmental immunity for all levels of government, including townships, cities, school districts, villages, and counties when

---

[18] *Maiden*, 461 Mich at 119.

[19] *Id.*

[20] See *Robinson v Detroit*, 462 Mich 439, 445; 613 NW2d 307 (2000); see also *Guider v Smith*, 431 Mich 559, 572; 431 NW2d 810 (1988) (noting a case should proceed to trial if there is a question of fact that would affect the availability of immunity).

[21] *Odom*, 482 Mich at 467.

[22] *Driver v Naini*, 490 Mich 239, 246-247; 802 NW2d 311 (2011).

[23] *Id.* at 247.

those subdivisions were engaged in a governmental function.[24]   Our common law has also long recognized that certain individuals may enjoy immunity from tort liability, historically granting immunity to governmental "officers, employees, and agents . . . engaged in discretionary, as opposed to ministerial, acts which were within the scope of their authority."[25]   Over time, however, our caselaw muddled the parameters of individual immunity by defining it with references to ultra vires acts and whether an individual was engaged in the exercise of a governmental function.[26]

We thus endeavored to clarify the common law of individual immunity in *Ross v Consumers Power Co (On Rehearing)*, in which we distinguished between the immunity available to lower-level employees and high-ranking officials.   We modified the ultra

---

[24] See *Pohutski v City of Allen Park*, 465 Mich 675, 682; 641 NW2d 219 (2002) (citation omitted); *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 605, 695; 363 NW2d 641 (1984).

[25] *Ross*, 420 Mich at 626.  Discretionary acts require "personal deliberation, decision, and judgment," whereas ministerial acts constitute "an obedience to orders or the performance of a duty in which the individual has little or no choice."  *Id*. at 634.  The distinction between the two is that "the former involves significant decision-making, while the latter involves the execution of a decision and might entail some minor decision-making." *Id.* at 635.

[26] As we explained in *Ross*, "*ultra vires* activities are those which are unauthorized and outside the scope of employment." *Id.* at 631.  In *Ross*, we criticized the ultra vires approach because, under the state of the law at that time, the ultra vires approach granted immunity to every public employee acting within the scope of employment regardless of whether he or she was engaged in a ministerial or discretionary act.  In *Ross*, we also expressly disavowed the "governmental function" approach, which granted individual immunity if the individual's actions were not ultra vires and were within the scope of the discharge of a governmental function.  We explained that individual immunity could not be defined in reference to simply whether the tortfeasor was engaged in a governmental function. *Id.*

vires approach for lower-level employees and required them to show that they were not only (1) acting during the course of their employment and acting or reasonably believed they were acting, within the scope of their authority; but also that they were (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts.[27] In comparison, we identified certain high-ranking officials entitled to a broader grant of immunity, holding that "judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their judicial, legislative, or executive authority."[28] We, thus, retained an approach similar to the ultra vires approach for high-ranking officials, providing absolute immunity whenever high-ranking officials acted within the scope of their respective authority.[29] Then, two years after *Ross*, the Legislature amended the GTLA, as it relates to the present dispute, by codifying *Ross*'s grant of absolute immunity at MCL 691.1407(5).[30]

With this historical context in mind, we turn to the language of MCL 691.1407(5), which provides certain high-ranking officials with absolute immunity from tort liability, to determine whether Jaskowski is entitled to absolute immunity. It states:

> A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for

---

[27] *Id.* at 633-634.

[28] *Id.* at 633.

[29] In this regard, we disagree with the dissent's characterization of *Ross* as rejecting the ultra vires approach to individual absolute immunity.

[30] See *Odom*, 482 Mich at 469 (explaining the legislative action post-*Ross*).

injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.

To qualify for absolute immunity from tort liability an individual governmental employee must prove his or her entitlement to immunity by establishing, consistently with the statute's plain language, (1) that he or she is a judge, legislator, or the elective or highest appointive executive official of a level of government and (2) that he or she acted within the scope of his or her judicial, legislative, or executive authority.[31] In the circuit court, Petipren argued that Jaskowski was not the highest appointive executive official of a level of government.[32] On appeal, Petipren abandoned this argument, leaving the sole issue before this Court as whether Jaskowski acted within the scope of his executive authority when he arrested Petipren. To determine whether Jaskowski qualifies for absolute immunity under MCL 691.1407(5) when performing the duties of an ordinary police officer while serving as the highest appointive executive official of the village, we examine the meaning of "executive authority" as interpreted in this state's jurisprudence.

---

[31] MCL 691.1407(5); see also *Marrocco*, 431 Mich at 710-711 (recognizing that executive officials "are not immune from tort liability for acts not within their executive authority"); *Odom*, 482 Mich at 479 (recognizing that entitlement to governmental immunity must be established as an affirmative defense).

[32] Contrary to Petipren's arguments in the circuit court, caselaw recognizes that a chief of police, as head of the police department, qualifies as the highest appointive executive official of a level of government. See, e.g., *Payton v Detroit*, 211 Mich App 375, 394; 536 NW2d 233 (1995) ("[W]hen acting in his executive authority, the police chief of the City of Detroit is absolutely immune from tort liability."); *Washington v Starke*, 173 Mich App 230, 240-241; 433 NW2d 834 (1988) (holding that the highest executive in the city's police department was entitled to absolute immunity); *Meadows v Detroit*, 164 Mich App 418, 427; 418 NW2d 100 (1987) (holding that the chief of police was absolutely immune from tort liability).

## A. EXECUTIVE AUTHORITY

Petipren, like the Court of Appeals, asserts that Jaskowski engaged in activities outside the scope of his executive authority when he arrested Petipren and is therefore not entitled to absolute immunity. As the Court of Appeals acknowledged, no decision of this Court has specifically considered whether the scope of a police chief's executive authority under MCL 691.1407(5) may include those activities also performed by ordinary officers.[33] Further, the GTLA does not define what it means to "act[] within the scope of his or her . . . executive authority," nor has this Court expressly defined the parameters of the phrase. However, we have previously identified several factors as relevant to the determination whether an action is within the scope of an executive official's authority. Specifically, we recognized in *American Transmissions* that

> "[t]he determination whether particular acts are within their [executive] authority depends on a number of factors, including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government."[34]

---

[33] Several decisions cited by the Court of Appeals considered whether conduct, such as supervisory decisions, employment decisions, and public comments, fell within a police chief's executive authority. See *Bennett v Detroit Police Chief*, 274 Mich App 307, 313-315; 732 NW2d 164 (2007); *Washington*, 173 Mich App at 241; *Meadows*, 164 Mich App at 427. However, as the Court of Appeals acknowledged, none of these decisions considered whether executive authority includes actions that might also be performed by lower-level officers. For this reason, these cases do not directly address the issue presented in the current case.

[34] *American Transmissions*, 454 Mich at 141, quoting *Marrocco*, 431 Mich at 711.

This list of factors, while not exhaustive, demonstrates the type of objective inquiry into the factual context that is necessary to determine the scope of the actor's executive authority.[35] This objective inquiry does not include analysis of the actor's subjective state of mind.[36] An official's motive or intent has no bearing on the scope of his or her executive authority.[37]

While the factors outlined in *American Transmissions* remain relevant to the determination whether certain acts are within the scope of an executive's authority, they do not resolve the definitional issue regarding whether the Legislature intended "executive authority" to include activities also performed by lower-level officials or, as the Court of Appeals held, to include only duties exclusive to the elective or highest appointive executive official's position. To resolve this issue, we turn to the statute's plain language.

Again, MCL 691.1407(5) provides that, to claim absolute immunity, the highest appointive executive official must "act[] within the scope of his or her . . . executive authority." We begin our analysis of the phrase "executive authority" by examining the term's plain and ordinary meaning.[38] "Authority" is defined as "a power or right

---

[35] *Id.* at 143 n 10.

[36] *Id.* at 141-143 (recognizing that the Legislature did not provide a malevolent-heart exception to the grant of absolute immunity contained in MCL 691.1407(5) and rejecting a Court of Appeals decision that introduced concepts of intent and motive into the absolute-immunity context).

[37] See *id.*

[38] See *Driver*, 490 Mich at 246-247.

delegated or given," and "scope" is defined as the "extent or range of view, outlook, application, operation, effectiveness . . . ."[39] Taken together, the words indicate that a highest appointive executive official's scope of authority consists of the extent or range of his or her delegated executive power.

In determining what the Legislature intended by the use of the term "executive," we are mindful of the principle that statutory words are to be "given meaning by [their] context or setting."[40] In context, the words "executive authority" appear as the counterpart to the statute's reference to "judicial" and "legislative" authority. Specifically, the statute grants immunity to certain high-level officials when they act within the scope of their "*judicial, legislative, or executive* authority." Because the words are grouped together in a list, we assume those words were intended to have a related meaning.[41] By using the term "executive" in conjunction with the terms "judicial" and "legislative," the Legislature plainly referred to the axiomatic power division among the three branches of government—legislative, executive, and judicial.[42] This reference to

---

[39] *Random House Webster's College Dictionary* (2001); see also *Backus v Kauffman (On Rehearing)*, 238 Mich App 402, 409; 605 NW2d 690 (1999).

[40] *Tyler v Livonia Pub Sch*, 459 Mich 382, 390-391; 590 NW2d 560 (1999) ("Contextual understanding of statutes is generally grounded in the doctrine of *noscitur a sociis:* '[i]t is known from its associates[.]'"); see also *Hamed v Wayne Co*, 490 Mich 1, 8; 803 NW2d 237 (2011) ("We read the statutory language in context and as a whole, considering the plain and ordinary meaning of every word.").

[41] *Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 533; 697 NW2d 895 (2005), citing *Third Nat'l Bank in Nashville v Impac Ltd, Inc*, 432 US 312, 322; 97 S Ct 2307; 53 L Ed 2d 368 (1977).

[42] See Const 1963, art 3, § 2 ("The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall

16

the three branches of government parallels the statute's earlier description of who may claim absolute immunity, namely: "[a] judge, a legislator, and the elective or highest appointive *executive* official of all levels of government . . . ." In both instances, the term "executive" appears in MCL 691.1407(5) as a reference to the executive branch of government, thereby referring to the authority exercised by individuals in that branch of government. In a similar fashion, the statute envisions a legislator's exercise of legislative authority and a judge's exercise of judicial authority. Nowhere does the statute contain any indication that the "executive authority" exercised must be exclusive to the elective or highest appointive official in order for that official to claim absolute immunity.

We therefore hold that "executive authority" as used in MCL 691.1407(5) means all authority vested in the highest executive official by virtue of his or her position in the executive branch. In so concluding, we reject other possible interpretations of the term "executive," including the notion proposed by the Court of Appeals, Petipren, and the dissent that it should be read as referring to high-level administrative or supervisory functions particular to an executive's office. That interpretation ignores the context in which the term "executive" is used. In context, the term "executive authority" does not contemplate whether the highest appointive executive official performed high-level

_____

exercise powers properly belonging to another branch except as expressly provided in this constitution."); *People v Salsbury*, 134 Mich 537, 547-548; 96 NW 936 (1903) ("In government 'executive' is distinguished from 'legislative' and 'judicial;' 'legislative' being applied to the organ or organs of government which make the laws, 'judicial' to that which interprets and applies the laws, and 'executive' to that which carries them into effect.") (citations and quotation marks omitted).

duties exclusive to his or her position, but simply whether the official exercised authority vested in the official by virtue of his or her role in the executive branch.[43]

In reaching the contrary conclusion, the Court of Appeals failed to undertake any explication of the statute's plain language and relied instead on a federal district court decision, *Scozzari v City of Clare*.[44] In that case, a city police chief sought absolute immunity under MCL 691.1407(5) from numerous tort claims resulting from a shooting death that had occurred when the chief attempted to arrest the decedent. The federal court rejected the police chief's claim of absolute immunity, reasoning that "[t]he Chief does not address the fact that he appears to have been acting in his capacity as an officer on patrol, rather than performing any tasks particular to his position as the 'highest appointive official.'"[45] In our view, *Scozzari* is devoid of any persuasive value: the court engaged in no statutory analysis and simply dismissed the police chief's assertion of absolute immunity in light of his failure to address the implications of the fact that he had acted as an ordinary officer.[46] Further, the implicit holding of *Scozzari*, that absolute

---

[43] Contrary to the dissent's suggestion, in adopting this construction of the term "executive authority," we do not discard the factors discussed in *American Transmissions*, 454 Mich at 141. Our holding today merely clarifies that conduct is not excluded from the scope of an official's executive authority simply because it is not exclusive to the official's position. Indeed, it is the dissent that effectively disregards these factors by advancing an interpretation that there is some "specific and limited subset" of "truly executive" authority.

[44] See *Petipren*, 294 Mich App at 431-432, discussing *Scozzari*, 723 F Supp 2d at 967.

[45] *Scozzari*, 723 F Supp 2d at 967.

[46] *Id*. In this regard, we agree with the Court of Appeals dissent's criticism of the majority's reliance on *Scozzari*, because, in the dissent's words, the "pivotal basis of the [*Scozzari*] court's holding was that the defendant [unlike Jaskowski] *failed to address*

18

immunity is only available when an official performs acts unique to his or her position as the highest executive official, is detached from the plain language of the statute, as we have previously explained. In any case, *Scozzari* is a decision of a lower federal court, and we are not bound to follow it.[47]

The Court of Appeals also erroneously justified its holding on the basis of what it perceived as an "illogical result." According to the Court of Appeals, it would be illogical to confer absolute immunity on a police chief who was acting as an ordinary officer because an ordinary officer engaged in the same conduct would be entitled only to the qualified immunity offered by MCL 691.1407(2) or, in the case of an intentional tort, the common-law immunity described in *Ross*.[48] Yet this outcome is exactly what the

---

whether his authority extended to those also exercised by a patrol officer." *Petipren*, 294 Mich App at 436 n 3 (MURRAY, P.J., dissenting). In other words, *Scozzari* is readily distinguishable from the instant matter.

[47] *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[48] *Ross*, 420 Mich 567. In *Odom*, this Court summarized the availability of immunity for lower-level employees. We explained that, in cases of negligence, to qualify for immunity under MCL 691.1407(2), the governmental employee must show:

> (a) the individual was acting or reasonably believed that he was acting within the scope of his authority,
>
> (b) the governmental agency was engaged in the exercise or discharge of a governmental function, and
>
> (c) the individual's conduct [did not] amount[] to gross negligence that was the proximate cause of the injury or damage. [*Odom*, 482 Mich at 479-480.]

In comparison, we recognized that immunity is available to lower-level employees against claims of an intentional tort if the employee can satisfy the common-law immunity described in *Ross* by showing the following:

19

Legislature intended when it distinguished between the absolute immunity available to those actors at the highest levels of government and the lesser immunity available to those actors who are lower-level employees.[49] While it is true that lower-level actors and high-ranking officials may possess some overlapping authority and, at times, engage in the same governmental conduct, MCL 691.1407(5) includes no indication that the absolute immunity granted to high-ranking officials is not absolute when their authority encompasses conduct that might also be performed by a lower-level employee. To adopt the Court of Appeals' understanding of executive authority would eviscerate the Legislature's clear intent to completely insulate individuals at the highest levels of

> (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
>
> (b) the acts were undertaken in good faith, or were not undertaken with malice, and
>
> (c) the acts were discretionary, as opposed to ministerial. [*Id.* at 480, discussing *Ross*, 420 Mich at 633-634.]

[49] The dissent effectively eviscerates these distinct levels of protection by reading MCL 691.1407(2) and MCL 691.1407(5) together to mean that high-level officials are merely entitled to qualified immunity if they are not acting within their limited subset of high-level authority. The dissent's interpretation, however, is not supported by a reading of subsections (2) and (5) together, but rather hinges entirely on the premise that "executive authority" under subsection (5) includes only a subset of high-level duties. Once this premise is rejected, as it must be given the plain language of subsection (5), there is nothing in the language of either subsection (2) or subsection (5), singly or together, to indicate that a high-level official is entitled to only qualified immunity for conduct outside the supposed subset of high-level duties. Regarding this point, we disagree with the dissent's suggestion that we have not given its interpretation a "faithful reading." We have simply concluded that the dissent's interpretation does not adhere to the plain language of the statute.

20

government from tort liability when they are acting within the scope of their official authority. While the Court of Appeals viewed this result as illogical, the propriety of the Legislature's decision to treat individuals differently on the basis of their official positions is a question of policy for the Legislature, not this Court.[50]

Accordingly, the Court of Appeals erred when it interpreted "executive authority" to include only those high-level tasks exclusive to the official's position. Rather, we hold, consistent with the plain meaning of "executive authority," that the highest appointive executive official is entitled to absolute immunity under MCL 691.1407(5) even when performing the acts of a lower-level employee if those actions are within the authority vested in the official by virtue of his or her role as an executive official.

## B. APPLICATION

Our analysis does not end with our determination that the term "executive authority" in MCL 691.1407(5) refers to all those powers vested in the highest executive official by virtue of his or her role as an executive official, which may also include those functions performed by lower-level employees. Because the specific acts alleged involve Jaskowski's arrest of Petipren, we consider whether Jaskowski's executive authority actually included the ability to conduct an arrest. This inquiry requires consideration of

---

[50] See *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 759; 641 NW2d 567 (2002) ("[The] judicial role precludes imposing different policy choices than those selected by the Legislature . . . .") (quotation marks and citation omitted); *Gilliam v Hi-Temp Prod, Inc*, 260 Mich App 98, 109; 677 NW2d 856 (2003) ("The fact that a statute appears to be impolitic, unwise, or unfair is not sufficient to permit judicial construction. The wisdom of a statute is for the determination of the Legislature and the law must be enforced as written.").

the factors articulated in *American Transmissions*, including "'the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government.'"[51]

In this case, there is no factual dispute regarding the duties Jaskowski's position required him to perform or that, by virtue of his position as chief of police, Jaskowski was also a police officer, meaning that he possessed the power of any ordinary officer to conduct an arrest.[52] By statute, village police officers are vested "with authority necessary for the preservation of quiet and good order in the village."[53] As officers charged with the preservation of public peace, village police officers possess statutory authority to conduct an arrest.[54] As chief of police, Jaskowski was also charged with the

---

[51] *American Transmissions*, 454 Mich at 141, quoting *Marrocco*, 431 Mich at 711. Notably, on the basis of its erroneous understanding of the term "executive authority," the Court of Appeals wrongly disregarded all the evidence relevant to this inquiry except for the essential duties of Jaskowski's job description.

[52] Petipren recognizes that Jaskowski is the chief of police, and he does not challenge the accuracy of the police chief job description or the veracity of Jaskowski's affidavit describing his obligations as chief of police.

[53] MCL 70.14. They are similarly vested "within the village . . . with all the powers conferred upon sheriffs for the preservation of quiet and good order . . . ." MCL 70.16.

[54] MCL 70.14 (authorizing village police to "suppress . . . disturbances, and breaches of the peace," and to "apprehend upon view any person found violating a state law or village ordinance in a manner involving a breach of the peace"); MCL 764.15(1) (describing the circumstances in which a "peace officer" may conduct an arrest without a warrant); see also *People v Bissonette*, 327 Mich 349, 356; 42 NW2d 113 (1950) (defining the term "peace officer" as generally including "sheriffs and their deputies, constables, marshals, members of the police force of cities, and other officers whose duty is to enforce and preserve the public peace") (quotation marks and citation omitted).

duty to "see that all the ordinances and regulations of the council, made for the preservation of quiet, and good order, and the protection of persons and property, are promptly enforced."[55]

In addition to this statutory authority to conduct an arrest, Jaskowski presented to the circuit court his job description, as provided to him by the Port Sanilac Village Council, detailing his duties and responsibilities. Of particular relevance are the sections of the job description describing the functional responsibilities of the police department, which include "[m]aintenance of law and order in the Village of Port Sanilac" and "[t]he enforcement of all laws of the United States, the State of Michigan, and all ordinance of such law, and ordinances of the Village of Port Sanilac." Most significantly, these responsibilities also include a duty to "[p]reserve the peace . . . , control public gatherings," "[r]eceive and process complaints by citizens," and "*arrest offenders . . . .*"[56]

Similarly, in an undisputed affidavit, Jaskowski quotes the job description and avers that his duties included patrolling the streets of the village and doing the following in the course of his patrolling:

---

[55] MCL 70.15.

[56] Emphasis added. The job description is rife with additional indications that in the village of Port Sanilac, the chief of police is expected to partake in those functions of a typical patrol officer. For example, the chief is expected to use guns, batons, handcuffs, police radios, Tasers, radar, and patrol car computers and aggressively operate a patrol car in emergencies. The job description also specifically advises that "physical intervention techniques may be necessary" and that the chief of police needs to be able to run and lift 300 pounds. The chief of police is also said to have a "[h]igh risk" of exposure to bloodborne pathogens, stemming from frequent and direct contact with individuals who might be carriers.

"[o]bserve and investigate persons, situations or things which require attention and which affect enforcement of laws or prevention of crime. Preserve the peace and protect life and property, control public gatherings and perform miscellaneous services relative to public health and safety including property checks. . . . Receive and process complaints by citizens, *arrest offenders*, prepare reports and testify in court."[57]

Taking this evidence as a whole, there is no genuine issue of material fact with regard to whether Jaskowski possessed the authority to conduct an arrest and act for the preservation of peace in his official capacity as chief of police. Where, as here, the highest appointive executive official acts within the authority vested in the official by virtue of his or her executive position and there are no questions of material fact, that official is entitled to absolute immunity as a matter of law.

The Court of Appeals erroneously affirmed the circuit court's denial of summary disposition when it incorrectly construed the term "executive authority" as including only high-level tasks exclusive to an executive's position. The Court of Appeals thereby disregarded all the evidence relevant to this inquiry, except for the essential duties listed in the job description for the position of chief of police. However, for reasons we have explained, there is no basis in the language of MCL 691.1407(5) for concluding that the highest executive official acts outside the scope of his or her executive authority when undertaking a task performed by lower-level employees, which is also undisputedly a task he or she is authorized to perform. That those activities might also be undertaken by lower-level employees does not alter the analysis for determining the scope of an official's executive authority.

---

[57] Emphasis added.

The circuit court's reason for denying summary disposition—that Jaskowski acted with personal animus—is also erroneous. Petipren implicitly resurrects this argument on appeal by offering extensive discussion of the circumstances surrounding his arrest, but as we have made clear, an actor's intent and motivation have no bearing on the scope of his or her executive authority under MCL 691.1407(5).[58] In sum, because the power to arrest unquestionably falls within the scope of Jaskowski's executive authority under MCL 691.1407(5), as a matter of law, Jaskowski is absolutely immune from tort liability stemming from Petipren's arrest, and the lower courts erred by denying Jaskowski's motions for summary disposition.

## IV. RESPONSE TO THE DISSENT

The dissent's main concern with our holding is that it "remov[es]" the statutory language from its context and returns Michigan's approach to individual absolute immunity to an "ultra vires" test that grants immunity based on the official's high-level status. However, in formulating its preferred holding, that the absolute immunity provided for under MCL 691.1407(5) is limited to "a specific subset of authority," the dissent reads "executive authority" in a manner isolated from the context in which it is used. By focusing only on the terms that directly modify the word "authority," the dissent ignores the necessary parallel between the official's position and his or her judicial, legislative, or executive authority and thereby fails to afford meaning to every word in the statute. Further, by overlooking the term "executive" as a clear reference to the authority exercised by those in the executive branch of government and instead

---

[58] See *American Transmissions*, 454 Mich at 143-144.

25

defining it as a specific subset of high-level duties related to "administrative or managerial responsibilit[ies]," the dissent reads additional requirements into the statute that do not exist. It is therefore the dissent that has "transform[ed]" the grant of absolute immunity to something other than the official's "executive authority" as intended by the Legislature.[59]

Similarly unpersuasive is the dissent's complaint that our holding grants absolute immunity to high-level officials simply because they are "cloaked with the title of a high-level executive." This accusation plainly oversimplifies our holding; any high-level executive official acting outside his or her executive authority, as we have defined it, is not entitled to absolute immunity. The dissent also protests that we have returned Michigan's approach to individual absolute immunity to an "ultra vires" test, which according to the dissent "was rejected by *Ross* . . . and, subsequently, the Legislature . . . ." However, a closer reading of *Ross* reveals that this Court merely criticized that approach and rejected it as to lower-level employees, not high-level

---

[59] In further support of its interpretation, the dissent proposes that the Legislature's codification of absolute immunity after our decision in *Ross* evinces a legislative intent to protect only a subset of high-level authority involving broad decision-making power. However, it is a fundamental principle of statutory interpretation that the Legislature speaks through the language used, *Driver*, 490 Mich at 246-247, and, as explained, the statutory language at issue does not protect only a subset of executive authority. Indeed, it is not our role to speculate whether the Legislature adopted the reasoning of the authorities that the *Ross* Court cited in support of its holding. Given the plain language of MCL 691.1407(5), it is thus irrelevant whether the members of the *Ross* Court intended that absolute immunity extend only to a subset of high-level decision-making authority. Therefore, the dissent's reliance on *Ross* to support its interpretation of "executive authority" is misplaced.

26

judicial officers, legislators, and executive officials.[60] To the extent it can be said that the Legislature codified the absolute individual immunity articulated in *Ross*, it did not reject the ultra vires test. Indeed, given the plain language of MCL 691.1407(5), the Legislature's codification of absolute immunity with regard to high-level officials is consistent the ultra vires approach and is precisely necessary to protect high-level officers' unfettered decision-making.[61]

In short, there is no support in the law for the dissent's characterization of our holding as adopting a rule of individual absolute immunity that radically departs from the statutory language and that has supposedly been rejected by the Legislature. Rather, it is the dissent's view that would depart from the statutory language and it is the dissent's view that would adopt a test not recognized anywhere in Michigan law. Indeed, our review of the caselaw reveals no authority, aside from the Court of Appeals decision in this case, confining individual absolute immunity to a subset of high-level authority.

---

[60] Although the dissent contends that *Ross* "rejected" the ultra vires approach, this assertion has not been supported with citation to an express statement to this effect from *Ross*. At most, *Ross* indicated that the ultra vires approach had "its drawbacks." *Ross*, 420 Mich at 631.

[61] The dissent claims that our definition of "executive authority" as encompassing "all authority" "extends absolute immunity beyond its purpose . . . ." However, the unworkability of the dissent's approach demonstrates exactly why the dissent's interpretation would hinder "'unfettered governmental decision-making,'" *Ross*, 420 Mich at 632 (citation omitted), and why our holding is entirely consistent with the purpose of absolute immunity. Mainly, to adopt the dissent's definition of "executive authority" as including only a "specific subset of authority," would place officials in the untenable position of continually attempting to discern which of their executive actions are somehow *more* executive than others so as to fall into the protected "subset" of executive authority. In the face of that uncertainty, high level officials would undoubtedly be constrained in their decision-making.

## V. CONCLUSION

The term "executive authority," as used in MCL 691.1407(5), encompasses all authority vested in the highest appointive executive official of a level of government by virtue of his or her role in the executive branch, including the authority vested in the official to engage in tasks that might also be performed by lower-level employees. Under the statute's plain terms, when the highest appointive executive official of a level of government acts within the scope of his or her executive authority, the official is entitled to absolute immunity. Because there is no genuine issue of material fact that Jaskowski's executive authority encompassed the authority to preserve the peace and conduct an arrest, Jaskowski is absolutely immune under MCL 691.1407(5) from tort liability arising from Petipren's arrest. For this reason, we reverse the Court of Appeals' conclusion to the contrary and remand this matter to the circuit court for entry of judgment in favor of Jaskowski in Sanilac Circuit Court Docket No. 09-032990-NO, for entry of judgment in favor of Jaskowski on Petipren's counterclaims in Sanilac Circuit Court Docket No. 10-033374-NO, and for further proceedings not inconsistent with this opinion.

Mary Beth Kelly
Robert P. Young, Jr.
Brian K. Zahra

28

## S T A T E   O F   M I C H I G A N

## SUPREME COURT

THOMAS J. PETIPREN,

       Plaintiff-Appellee,

v                                                                No. 144142

RODNEY JASKOWSKI,

       Defendant-Appellant.

and

VILLAGE OF PORT SANILAC,

       Defendant.

_____

RODNEY JASKOWSKI,

       Plaintiff/
       Counterdefendant-Appellant,

v                                                                No. 144143

THOMAS J. PETIPREN,

       Defendant/
       Counterplaintiff-Appellee.

_____

CAVANAGH, J. (*dissenting*).

      In this case, this Court must decide what the Legislature determined to be the appropriate balance between the public interest in ensuring that certain governmental actions are performed with independence and without fear of liability on one hand, and,

on the other hand, ensuring that victims of tortious actions are compensated when certain governmental employees commit a tort. Specifically, this Court is asked to decide whether a chief of police, Rodney Jaskowski, who allegedly engaged in tortious conduct against Thomas Petipren while performing the duties of an ordinary police officer is nevertheless entitled to absolute immunity from tort liability under MCL 691.1407(5), simply by virtue of his status as the highest appointive executive official of a level of government.

I believe that the majority errs by concluding that the phrase "executive authority" refers to *all* authority vested in the elective or highest appointive executive official by virtue of his or her position in the executive branch. In my opinion, the majority's interpretation erroneously reads the phrase "executive authority" as coextensive with the phrase "executive branch" as used in the Michigan Constitution and, in doing so, not only fails to give meaning to every word in the statute but also effectively grants absolute immunity solely on the basis of an official's status as a high-level executive, regardless of the nature of the conduct in which the official was engaged. Contrary to the majority position, I would hold that the word "executive" within the phrase "executive authority" refers to a specific subset of authority that a high-level executive must be acting within the scope of to obtain the benefit of absolute immunity from tort liability. Because I believe that the majority's approach fails to give effect to the Legislature's intent and extends the scope of the protection of absolute immunity further than the Legislature prescribed, I respectfully dissent.

2

# I. A BRIEF HISTORY OF INDIVIDUAL IMMUNITY FOR PUBLIC EMPLOYEES

Suits for monetary damages generally serve dual purposes: to compensate victims of wrongful actions and to discourage conduct that might result in liability. *Forrester v White*, 484 US 219, 223; 108 S Ct 538; 98 L Ed 2d 555 (1988). Difficulty arises, however, when public employees are exposed to tort liability. *Id.* This is because government officials are expected to make decisions that must be "informed by considerations other than the personal interests of the decisionmaker," yet such decisions will often have adverse effects on others. *Id.* As a result, although the threat of monetary damages might encourage public officials to lawfully perform their duties in an appropriate manner, the threat of liability might also "*inhibit* officials in the proper performance of their duties." *Id.* Recognition of these issues has led jurisdictions, including Michigan, to adopt various forms of governmental immunity from tort liability. *Id.*

Michigan's approach to individual immunity for governmental employees has its historical roots in the common law. *Robinson v City of Lansing*, 486 Mich 1, 5; 782 NW2d 171 (2010). After this Court partially abolished common-law governmental immunity in 1961, the Legislature responded by enacting the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, to "restor[e] immunity for municipalities and preserv[e] . . . protection for the state and its agencies." *Id.* See, also, *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 605; 363 NW2d 641 (1984). The GTLA, however, was silent regarding under what circumstances, and to what extent, officers, agents, and employees could be held responsible for their tortious acts. *Ross*, 420 Mich at 596, 628. Given the divided, confusing, and often irreconcilable caselaw on the

subject, *id*. at 596, *Ross* undertook the almost impossible task of attempting to clarify more than a century's worth of judicial and legislative commentary on governmental immunity, including clarifying the judicial debate regarding liability with respect to individual governmental employees.

With respect to individual liability, *Ross* explained that previous opinions of this Court had "obfuscated the precise parameters of individual immunity," noting that in divided decisions the Court had set forth differing approaches to the issue. *Ross*, 420 Mich at 629-630. In one case, the end result was that employees were immune from tort liability "unless they had been engaged in *ultra vires* activities." *Id*. at 629, citing *Bush v Oscoda Area Sch*, 405 Mich 716; 275 NW2d 268 (1979). In another case, members of the Court defined the "parameters of individual immunity with reference to whether the tortfeasor was engaged in the exercise or discharge of a governmental function." *Ross*, 420 Mich at 631. See, also, *id*. at 629-630, citing *Lockaby v Wayne Co*, 406 Mich 65; 276 NW2d 1 (1979). Rejecting the formulations of both approaches, this Court explained that the governmental-function approach blurred the distinction between individual and governmental immunity, *Ross*, 420 Mich at 629-630, while the ultra vires component of individual immunity, which examined whether the acts were "unauthorized and outside the scope of employment," also had its "drawbacks," *id.* at 631. See, also, *Richardson v Jackson Co*, 432 Mich 377, 387; 443 NW2d 105 (1989) (defining "ultra vires" activity as an "activity that the governmental agency lacks legal authority to perform in any manner"). This was because the formulation of the ultra vires approach at the time of *Ross* broadly extended immunity to "every public official, employee, and agent whenever

4

they engage[d] in [any] authorized act[],” which was “not justified by either prior case law or present-day realities.” *Ross*, 420 Mich at 631.

Persuaded that Michigan’s then existing framework regarding individual immunity was inept and in need of clarification, *Ross* adopted the approach to individual immunity that it believed best reflected the Legislature’s intent. *Id.* at 596, 625-626, 635. The adopted approach was similar to that of other jurisdictions, which provided different levels of immunity depending on the function of the officer. *Id.* at 632-634. Under this framework, “judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability,” as long as they are acting within their respective “judicial, legislative, or executive authority.” *Id.* at 633. In contrast, “[l]ower level officials, employees, and agents are immune from tort liability” only if (1) the act was taken during the course of the official’s, employee’s, or agent’s employment and the official, employee, or agent was acting, or reasonably believed he or she was acting, within the scope of his or her authority, (2) the act was done in good faith, and (3) the act was discretionary rather than ministerial in nature. *Id.* at 633-634. The justification for treating employees differently on the basis of their official functions was explained by *Ross* as follows:

> It is assumed through the broad grant of immunity to certain public employees that these officials and, therefore, their governmental agencies, will not be intimidated nor timid in the discharge of their public duties. Although absolute immunity may be necessary for unfettered governmental decision-making, courts have been reluctant, understandably, to extend its protection beyond select public employees who are delegated policy-making powers.

* * *

5

* * * The policy which only provides a limited immunity to lower level executive officials, unlike the justifications for absolute immunity, reflects a recognition that official immunity should not shield malicious or intentionally unlawful behavior when the actor is not engaged in broad, essential governmental decision-making. Holding these public servants liable does not hamper or intimidate them in the faithful discharge of their duties since they are responding to established administrative guidelines, regulations and informal policy. It is assumed, therefore, that an unreasonable burden does not fall on an administrative system when courts hold lower level executive employees liable for their acts performed in bad faith. [*Id.* at 632-633, quoting Littlejohn & DeMars, *Governmental Immunity After Parker and Perry: The King Can Do Some Wrong*, 1982 Det C L Rev, 1, 27-28 (quotation marks omitted).]

Although *Ross* retained the traditional view that no individual immunity existed for ultra vires acts, *Ross*, 420 Mich at 631, 634, *Ross* also made clear that, under its approach, individual immunity was "obvious[ly] . . . *far less* than that afforded [to] governmental agencies," which were broadly granted immunity from tort liability whenever the agency engaged in a mandated or authorized activity—i.e., an activity that was not "ultra vires." *Id.* at 635 (emphasis added). See, also, *id.* at 620; MCL 691.1407(1); MCL 691.1401(b).

Shortly after *Ross* was decided, the Legislature responded by enacting 1986 PA 175, which, among other things, addressed individual immunity for governmental employees. With slight modifications, the Legislature codified *Ross*'s standard with respect to judges, legislators, and specific executive officials, thus rendering those officials "immune from tort liability" when acting within the scope of their respective authority. MCL 691.1407(5); *American Transmissions, Inc v Attorney General*, 454 Mich 135, 139-140; 560 NW2d 50 (1997). However, the Legislature altered *Ross*'s articulation of qualified immunity as it related to the negligent acts of what *Ross* referred

to as "lower level" officials, employees, and agents.[1] Specifically, in addressing individual immunity from tort liability for public employees, the Legislature enacted the following framework:

> (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, *each officer and employee of a governmental agency*, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency *is immune from tort liability* for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency *if all of the following are met*:

> (a) *The officer, employee, member, or volunteer is acting* or reasonably believes he or she is acting *within the scope of his or her authority.*

> (b) The governmental agency is engaged in the exercise or discharge of a governmental function.

> (c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

> (3) Subsection (2) does not alter the law of intentional torts as it existed before July 7, 1986.

> * * *

> (5) A judge, a legislator, and *the elective or highest appointive executive official* of all levels of government *are immune from tort liability* for injuries to persons or damages to property *if he or she is acting within*

---

[1] See *Odom v Wayne Co*, 482 Mich 459, 471; 760 NW2d 217 (2008), wherein a majority of this Court held that the Legislature retained *Ross*'s standard with respect to intentional torts, but, in enacting MCL 691.1407(2) and (3), modified *Ross*'s standard with respect to negligent acts. Thus, under the majority opinion in *Odom*, *Ross*'s standard applies to alleged intentional torts, whereas the standard articulated in MCL 691.1407(2) applies to alleged negligence.

7

*the scope of his* or her judicial, legislative, or *executive* authority. [MCL 691.1407 (emphasis added).]

Accordingly, in both MCL 691.1407(2) and (5), the Legislature indicated that certain governmental officers and employees are "immune from tort liability" if specific conditions are met. Under MCL 691.1407(2), an officer or employee must act within the "scope of his or her authority" and meet other conditions, whereas, under MCL 691.1407(5), a judge, legislator, or specific high-level executive official is only entitled immunity from tort liability if the person is "acting within the scope of his or her *judicial*, *legislative*, or *executive* authority." (Emphasis added.) Because the statute does not define the latter phrase, and no opinion from this Court has expressly considered this issue, this Court must determine the meaning of the phrase that best effectuates the Legislature's intent.[2] *Jennings v Southwood*, 446 Mich 125, 136; 521 NW2d 230 (1994).

## II. ANALYSIS

### A. THE MAJORITY'S INTERPRETATION OF MCL 691.1407(5)

As previously noted, I cannot join the majority's analysis, which, in my opinion, fails to give effect to every word in the statute, and broadens the scope of absolute immunity beyond the intent of the Legislature.[3] Under MCL 691.1407(5), a "judge, a

---

[2] The majority asserts that this dissent adopts a view that is not recognized in Michigan law and implicitly accuses this dissent of citing no caselaw in support of its position. The majority's assertions, however, are rather curious, given that even the majority acknowledges that no decision of this Court has specifically addressed the issue presented in this case. Indeed, I question whether this Court would have granted leave to appeal if binding, on-point authority existed.

[3] Although this Court has yet to expressly address whether a chief of police is an "elective or highest appointive executive official of all levels of government" for purposes of immunity from tort liability under MCL 691.1407(5), as noted by the majority, Petipren has effectively abandoned his previous argument that Jaskowski does

8

legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property *if he or she is acting within the scope of his or her judicial, legislative, or executive* authority." (Emphasis added.) Thus, certain high-level executive officials are entitled to immunity from tort liability if the executive official acts within the scope of his or her *executive* authority.

The majority's analysis, however, begins by removing the phrase "scope of his or her . . . authority" from its context. Specifically, rather than considering whether the statutory references to "judicial," "legislative," and "executive" modify the phrase "authority"—in order to describe a specific and limited subset of each public official's authority that the official must act "within the scope of" to be entitled to immunity—the majority focuses on the phrases "judicial," "legislative," and "executive" to read them as a mere reference to the axiomatic power divide among the three branches of government. However, the language chosen by the Legislature did not expressly grant immunity from tort liability for actions taken by the highest executive official by virtue of his or her position in the executive *branch*. Instead, the Legislature granted immunity from tort liability for those actions that fall "within the scope of" an executive official's "executive authority." As a result, the majority's interpretation transforms the statutory reference to "executive authority" into a reference to the "executive branch of government." In my opinion, this is erroneous.

---

not fall under this category. See *People v Bean*, 457 Mich 677, 685 n 13; 580 NW2d 390 (1998). As a result, I will assume that this standard was met for purposes of this appeal.

9

In reading the phrase "executive authority" as coextensive with the phrase "executive branch" as it is used in the Constitution, the majority's analysis results in a reading of the statute that is contrary to the well-established maxim that this Court presumes that *every word* in a statute should be given meaning. *In re MCI Telecom Complaint*, 460 Mich 396, 414; 596 NW2d 164 (1999). See, also, *Robinson*, 486 Mich at 17-18. Specifically, by holding that the reference to "legislative," "judicial," and "executive" merely parallels the statute's earlier reference to *who* is entitled to assert immunity, the majority interprets the statute as granting an official immunity from tort liability for all actions "within his or her authority." Thus, the majority's interpretation renders the statutory references to "judicial," legislative," and "executive" within the phrase "*judicial, legislative, or executive* authority" mere reiterations, which, "by definition, creates surplus language." *Odom v Wayne Co*, 482 Mich 459, 471; 760 NW2d 217 (2008).[4] See, also, *In re MCI*, 460 Mich at 414 ("[A] court should avoid a construction that would render any part of the statute surplusage or nugatory."). Had the Legislature actually intended to grant judges, legislators, and specified high-level executives absolute immunity from tort liability for all actions "within the scope of his or

_____

[4] Indeed, had the Legislature intended the majority's interpretation—i.e., that the Legislature was merely referring to the axiomatic power divide between the three branches of government and, thus, the phrase "executive authority" encompasses *all* authority vested in the executive by virtue of his or her position within the executive branch—there would have been no need for the statute to refer to a public official's "judicial, legislative, or executive authority" because, as the majority notes, the Constitution expressly provides that "[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch" of government. Const 1963, art 3, § 2.

her authority" generally, the Legislature could have easily and clearly stated that, as it did in other provisions of the GTLA. See, e.g., MCL 691.1407(2) (providing that officers and employees are immune from tort liability if, among other things, the officer or employee is "acting within the scope of his or her authority").

Although this Court has not previously defined the phrase "executive authority," and thus has not expressly determined whether the phrase "executive authority" is limited to a subset of a high-level official's authority or encompasses all authority vested in the official, this Court *has* explained that executive officials are *not* absolutely immune from tort liability for those acts that *do not* fall within the scope of the elective or highest appointive executive official's "executive authority." *American Transmissions*, 454 Mich at 140-141, citing *Marrocco v Raudlett*, 431 Mich 700, 710-711; 433 NW2d 68 (1988). This Court has also provided lower courts with a nonexhaustive list of objective factors to consider in determining whether an act falls within the scope of the executive official's executive authority. *American Transmissions*, 454 Mich at 141, 143 n 10, citing *Marrocco*, 431 Mich at 711.[5] The majority's broad interpretation of the phrase

---

[5] Those factors include

> the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government. [*American Transmissions*, 454 Mich at 141 (citation and quotation marks omitted).]

Although *American Transmissions*, 454 Mich at 141 n 8, noted that a majority of this Court had previously opined that the inquiry into whether actions are within a public official's executive authority is *analogous* to the question whether lower-level officials or governmental agencies are engaged in governmental functions, as previously noted, *Ross* asserted that the immunity granted to individuals is "far less" than that afforded to

11

"executive authority," however, effectively discards the nonexhaustive list of factors in favor of one inquiry: whether the official was authorized to perform the act—whether by statute or otherwise, including "authorization" under a job description or an affidavit provided by the executive. By granting immunity for *any* authorized act, the majority's analysis returns Michigan's approach to immunity, at least as it pertains to high-level executives, to a formulation akin to the ultra vires approach that was rejected by *Ross*, 420 Mich at 631, 633, and, subsequently, by the Legislature when it adopted statutory language that limits absolute immunity to *only* those actions that fall within the scope of a high-level executive official's *executive* authority and, thus, refused to extend absolute immunity to such officials whenever they engage in *any* authorized act. See *In re MCI*, 460 Mich at 415 ("Where the Legislature has considered certain language and rejected it in favor of other language, the resulting statutory language should not be held to explicitly authorize what the Legislature explicitly rejected.").

### B. AN ALTERNATIVE APPROACH TO MCL 691.1407(5)

In my opinion, the statutory language supports the notion that the Legislature did not, as the majority opines, intend to afford absolute immunity for *all* actions within a judge, legislator, or high-level executive's authority, generally. Instead, by modifying the word "authority" with the words "judicial, legislative, or executive" the Legislature only intended to grant absolute immunity from tort liability for harm resulting from activities

---

governmental agencies, *Ross*, 420 Mich at 635. Further, *Ross* rejected "defin[ing] the parameters of individual immunity with reference to whether the tortfeasor was engaged in the exercise or discharge of a governmental function" because that approach "blurr[ed] two separate inquires." *Id.* at 630-631.

that are truly executive, judicial, or legislative in nature. See *Merriam-Webster's Collegiate Dictionary, Tenth Edition* (1999) (defining "judicial," in part, as "of or relating to a judgment, the function of judging, the administration of justice, or the judiciary"; defining "legislative," in part, as "having the power or performing the function of legislating"; and defining "executive," in part, as "having administrative or managerial responsibility"); *Ross*, 420 Mich at 632-633 (explaining that the justification for affording absolute immunity to certain officials is to protect unfettered decision-making by those "engaged in broad, essential governmental decision-making") (citation and quotation marks omitted). Thus, in accordance with the notion that this Court presumes that every word within a statute has some meaning, *People v McGraw*, 484 Mich 120, 126; 771 NW2d 655 (2009), I believe that the Legislature, in codifying *Ross*'s grant of absolute immunity for those officials acting within their respective *judicial*, *legislative*, and *executive* authorities, intended to describe a specific and limited subset of a judge's, legislator's, or high-level executive's authority that those officials must be "acting within the scope of" to obtain the benefit of immunity from tort liability. See *Ross*, 420 Mich at 632, citing Littlejohn & DeMars, 1982 Det C L Rev at 25-27.[6] In my

---

[6] Although I would only consider the scope of the immunity as applied to the facts of the present case, see *Marrocco*, 431 Mich at 712 (BOYLE, J., concurring), notably, the Littlejohn & DeMars article cited in *Ross* explained that, at the common law, "judges were always protected by absolute immunity for their judicial acts," even when maliciously performed, and, likewise, legislators were shielded from tort liability when they acted "in the sphere of *legitimate legislative* activity." Littlejohn & DeMars, 1982 Det C L Rev at 26 (citation and quotation marks omitted) (emphasis added). Given *Ross*'s reliance on that authority, I question the majority's holding that the statutory reference to judicial, legislative, and executive authority was simply a legislative intent to inquire whether judges, legislators, and high-level executive officials exercised *any* authority vested in them by virtue of their positions within their respective branches of

13

view, broadly interpreting the phrase "executive authority" as encompassing *all authority* vested in a high-level executive extends absolute immunity beyond its purpose—to protect unfettered governmental decision-making afforded to those with policy-making powers. *Ross*, 420 Mich at 632-633, quoting Littlejohn & DeMars, 1982 Det C L Rev at 27-28. See, also, *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998) (explaining that the primary goal of this Court is to give effect to the Legislature's intent through reasonable construction of the statutory language "in consideration of the purpose of the statute and the object sought to be accomplished") (citation and quotation marks omitted).

Additionally, reading the statutory provision as a whole supports a narrower interpretation of the phrase "executive authority" than that adopted by the majority. See *Robinson*, 486 Mich at 15 (explaining that it is well established that statutes must be read together and, thus, no single section should be viewed in isolation).[7] When MCL 691.1407(5) is read in conjunction with MCL 691.1407(2), it is clear that the Legislature

government, rather than defining a specific subset of each official's respective authority that is entitled to absolute immunity.

[7] The majority faults my dissent for reading the statutory provisions as a whole, and accuses me of adding requirements into the statutory language and somehow failing to give effect to each word within the statute. My response is simple: the majority's claims, as with the bulk of the majority's responses to this dissent, hinge entirely on accepting the majority's premise that the word "executive" as used within the phrase "*executive* authority" is a mere reiteration that simply parallels the statute's earlier reference to *who* is entitled to assert immunity. And, respectfully, a faithful reading of this dissent illustrates that it does not add words to the statutory language as the majority claims, but simply gives effect and meaning to *each* word within the statute—including the word "executive" within the phrase "executive authority."

14

did not intend to insulate high-level executive officials from tort liability whenever they act within the scope of *any* aspect of their authority simply because they are cloaked with the title of "executive." Instead, when the highest appointive executive official commits a tort while *not* acting within the scope of his or her "*executive* authority" under MCL 691.1407(5), the language of the respective statutes and the statutory scheme supports the notion that the official is not entitled to *absolute* immunity but might nevertheless be entitled to *qualified* immunity under MCL 691.1407(2) or, alternatively, the requirements delineated in *Ross* concerning intentional torts.[8]

Specifically, MCL 691.1407(2) provides that, except as otherwise provided in MCL 691.1407, each "officer" and "employee" of a governmental agency[9] is immune from tort liability for injury to person or property caused by the officer or employee while in the course of employment if the officer or employee was, among other things, "acting within the scope of *his or her authority*." (Emphasis added.) Thus, unlike MCL 691.1407(5), which qualifies the type of authority that the high-level executive must be acting within the scope of to be entitled to absolute immunity, MCL 691.1407(2) does not limit its application to a specific subset of an employee or officer's authority but, instead, refers to the general authority of governmental officers and employees. Further, MCL 691.1407(2) broadly refers to "officers" and "employees" in discussing the qualified immunity available under that subsection. It does not, in contrast to the *Ross* test, refer

---

[8] See note 1 of this opinion.

[9] See MCL 691.1401(a), (e), and (g) (defining "governmental agency" to include the "state and its agencies, departments, commissions, courts, boards, councils, and statutorily created task forces").

15

to "lower level" officers and employees only. Thus, the subsection was likely devised to apply not only to lower-level officers and employees, but to high-level officials in certain circumstances as well. And, although MCL 691.1407(2) does not expressly refer to "executive officials," an "executive official" is nevertheless an "employee" or "officer" of a governmental agency. See *Merriam-Webster's Collegiate Dictionary, Tenth Edition* (1999) (defining "officer" as an "AGENT" or "one who holds an office of trust, authority, or command," and defining "official" as "one who holds or is invested with an office : OFFICER"). Accordingly, the plain language of the statute as well as the statutory scheme supports the notion that an executive's title should not act to elevate *any* authorized act that is performed by a high-level executive into an act that is within the scope of his or her "executive authority" for purposes of absolute immunity. Instead, when a high-level executive is *not* acting within the scope of his or her *executive* authority, that executive should not be entitled to the "strong medicine" that is absolute immunity. *Forrester*, 484 US at 230 (citation and quotation marks omitted). Rather, as an employee or officer of a governmental agency, the high-level executive acting *outside* the scope of his or her executive authority is still entitled to seek the protections afforded by qualified immunity under MCL 691.1407(2) or *Ross* and, consequently, there is no unreasonable burden on the administration of government.

## C. APPLICATION

As applied to this case, I disagree with the majority that Jaskowski was entitled to absolute immunity under MCL 691.1407(5). Specifically, when a chief of police engages in conduct performed by an ordinary police officer, such as conducting an arrest, I would

16

hold that the chief of police is not entitled to absolute immunity simply because, as a police officer, the chief also has the authority to arrest. In carrying out the decision to arrest, Jaskowski was simply not acting within the scope of his executive authority as a highest appointive executive official.[10] Instead, he was acting within his authority as an ordinary police officer.

Applying the factors articulated by a majority of this Court to assist courts in determining whether an act falls within the scope of a high-level executive's executive authority, see *American Transmissions*, 454 Mich at 141, it is clear that Jaskowski, as the chief of police and, consequently, a police officer, indisputably had the authority to conduct an arrest. Nevertheless, Jaskowski's conduct in this case involved the quintessential conduct of an ordinary police officer, rather than the "executive authority" of the highest-ranking official of a level of government, especially when considering the structure and allocation of powers within the police department itself as demonstrated by the essential duties and responsibilities of defendant as the chief of police. See *Petipren v Jaskowski*, 294 Mich App 419, 427-429, 432 n 5; 812 NW2d 17 (2011).[11] Accordingly,

---

[10] It is notable that had a lower-ranked police officer committed the same acts as Jaskowski, that officer would be entitled to seek, at most, the more limited, qualified immunity available under MCL 691.1407(2) or *Ross*, 420 Mich at 633-634. Thus, the majority effectively grants him absolute immunity simply because he is cloaked with the title of a high-level executive. The majority asserts that this comment "plainly oversimplifies" its holding. However, as this example illustrates, this comment is a fair response in light of the consequences of the majority's holding, which include, under the facts of this case, granting immunity to Jaskowski because he simply happens to have been the chief of police, rather than an ordinary patrol officer.

[11] Jaskowski's job description, discussed by the majority, is divided into separate sections, including one titled "FUNCTIONAL RESPONSIBILITIES *OF THE POLICE DEPARTMENT*," and one titled "ESSENTIAL DUTIES AND RESPONSIBILITIES" of

Jaskowski should only be entitled to seek qualified immunity as provided to officers and employees under MCL 691.1407(2) and *Ross*.

### III. CONCLUSION

Because I believe that the phrase "executive authority" as used in MCL 691.1407(5) does not "encompass[] *all authority* vested in the highest appointive executive official of a level of government by virtue of his or her role in the executive branch," *ante* at 28 (emphasis added), but, instead, refers to a subset of authority within which the highest appointive executive official must act "within the scope of" to be entitled to absolute immunity, I respectfully dissent.

Michael F. Cavanagh
Stephen J. Markman

McCORMACK and VIVIANO, JJ., took no part in the decision of this case.

---

the "*Chief of Police*." (Emphasis altered). The duty to conduct arrests is noticeably absent from the latter section.