MARROCCO v RANDLETT

Docket No. 79802. Argued November 3, 1987 (Calendar No. 1). De-
cided December 5, 1988.

W. Thomas Marrocco, Jr., brought an action in the Macomb
Circuit Court against James Randlett, former mayor of the City
of Warren, and Lillian Dannis, the city treasurer, and others,
seeking damages for injuries resulting from the intentional
infliction of emotional distress and interference with contrac-
tual relations. The plaintiff alleged that the defendants pre-
vented him from performing his occupation which caused him
public humiliation and embarrassment, and that defendant
Dannis harassed him by raising the tax assessment on his
home, forcing sale below market value, and that the assess-
ment subsequently was reduced. The court, Kenneth N. San-
born, J., granted summary judgment for Randlett and Dannis,
on the ground that they were immune from tort liability as
government officials. The Court of Appeals, GRIBBS, P.J., and
WALSH and BEASLEY, JJ., affirmed in an opinion per curiam
(Docket No. 87357). The plaintiff appeals.

In an opinion by Justice LEVIN, joined by Chief Justice RILEY,
and Justices BRICKLEY, ARCHER, and GRIFFIN, the Supreme
Court held:

The highest executive officials of local government are not
immune from tort liability for acts outside their executive
authority. Whether particular acts are within executive author-
ity depends on factors including the nature of the specific acts
alleged, the position of the official alleged to have performed
the acts, the definition of the official's authority in the charter,
ordinance, or other local law, and the structure and allocation
of powers in the particular level of government.

1. The highest executive officials of all levels of government
are absolutely immune from all tort liability when acting

REFERENCES

Am Jur 2d, Municipal, County, School, and State Tort Liability
§§ 5, 206 et seq.
Am Jur 2d, Torts §§ 17, 53.
Comment Note.—Municipal immunity from liability for torts. 60
ALR2d 1198.

within their executive authority; however, the intentional use or misuse of a badge of governmental authority for a purpose unauthorized by law is not an exercise of a governmental function. In determining whether particular acts by executive officials are within executive authority, it is necessary to look to the powers of the offices of the executives as authorized by applicable ordinances or local law.

2. In this case, because the record is greatly limited, reversal and remand to the trial court are required for determination of the authority of the city officials and whether the particular acts alleged were within that authority.

Justice BOYLE, joined by Justice CAVANAGH, concurring, stated that the law of governmental authority should be developed in a systematic fashion on the bases of actual records in specific cases.

In this case, the order granting leave assumed the precedential value of the standard articulated in *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567 (1984), with regard to elected governmental officials, and limited the issue to the application of *Ross* to these facts. The majority appears to assume the precedential value of *Ross* and *Smith v Dep't of Public Health*, 428 Mich 540 (1987), in reasoning that the defendant officials' intentional tortious acts may carry them outside their authority and the scope of their immunity. However, because of the nature of the parties in *Ross* and *Smith,* the standards are dicta.

Given the scope of the order granting leave in this case, remand to the circuit court for further proceedings is proper because at least insofar as the mayor is alleged to have sought to have the plaintiff fired from the prosecutor's office, it is questionable whether there is immunity under the *Ross* standard.

Reversed and remanded.

GOVERNMENTAL IMMUNITY — MUNICIPAL OFFICIALS — EXECUTIVE AUTHORITY.

The highest executive officials of local government are not immune from tort liability for acts outside their executive authority; whether particular acts are within executive authority depends on factors including the nature of the specific acts alleged, the position of the official alleged to have performed the acts, the definition of the official's authority in the charter, ordinance, or other local law, and the structure and allocation of powers in the particular level of government.

*Weinstein, Gordon, Hoffman & Shulman, P.C.,*

and *Stewart, Nowak & Flinn, P.C.* (by *Eric G. Flinn)*, for the plaintiff.

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *Matthew A. Seward* and *Rosalind Rochkind*), for the defendants.

LEVIN, J. The question presented is whether the mayor and the treasurer of a home-rule city are absolutely immune from tort liability pursuant to *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984). The trial court granted summary disposition[1] for defendant elected municipal officials on plaintiff's claims alleging tortious conduct. The Court of Appeals affirmed.[2] We reverse because the plaintiff alleged conduct that, if true, may not have been within defendants' executive authority.

I

Plaintiff W. Thomas Marrocco, Jr., was examined on deposition at considerable length. That was the only evidence presented to the trial court by either the plaintiff or the defendants before the court granted summary disposition. We therefore address the legal issues on the basis of the facts Marrocco alleges. The factual record is greatly limited because this case has not been tried. The statement of facts that follows synthesizes Marrocco's allegations in his pleadings and during his depositions.

Marrocco was an assistant city attorney of Warren from 1972 to 1975, when he was appointed city attorney by Mayor Ted Bates. Marrocco asserts

---

[1] MCR 2.116(C)(8).

[2] *Marrocco v Randlett,* unpublished opinion per curiam of the Court of Appeals, decided October 30, 1986 (Docket No. 87357). We granted leave to appeal, 428 Mich 873; 402 NW2d 469 (1987).

that he applied for and was granted a leave of absence by the Civil Service Board from his civil service position as an assistant city attorney. Defendant Lillian Dannis was elected treasurer of Warren in 1979, and defendant James Randlett was elected mayor of Warren in 1981.

Antecedents of this controversy are described in *City of Warren v Dannis,* 136 Mich App 651, 654; 357 NW2d 731 (1984), where the Court of Appeals referred to a treasurer who preceded Dannis and "made some extremely questionable and completely inappropriate investments which ended in the city's losing large sums of money." These included certain arbitrage transactions. The Securities and Exchange Commission had been holding hearings regarding such transactions engaged in by the City of Ann Arbor and became interested in similar transactions by Warren. The Warren City Council followed Ann Arbor's lead in establishing an Investment Policy Commission (IPC) to set investment policy and oversee city investments. An advisory opinion of the Attorney General[3] agreed that the city council had not unlawfully delegated its authority in setting up the IPC. Marrocco was involved in the formation of the Warren IPC.

After her election as treasurer in 1979, Dannis refused to follow the investment policy. Marrocco's office brought an action for mandamus on behalf of the city to require compliance. Among the irregularities the city asserted in Dannis' behavior as treasurer was exceeding the limit on the amount of funds the city could deposit in one bank—in this instance the Bank of Warren—as a percentage of the bank's net worth. Subsequently, the court granted the city's motion to dismiss a show cause hearing—which had been scheduled for May, 1980

[3] Unpublished opinion of the Attorney General (Senator Art Miller, Jr.), April 20, 1980.

—and to allow it to amend the complaint to ask for a declaratory judgment. Marrocco said that Dannis altered her behavior so as to be in "substantial compliance" with the ordinance for two weeks, but then she again was out of compliance. The city did not seek a preliminary injunction. Two months after the city commenced the mandamus action, the city council adopted the investment policy as an ordinance, in an effort, according to Marrocco, to obtain Dannis' compliance without further litigation.

Marrocco alleges that Dannis and Randlett received consideration in the form of loans and high interest on personal accounts from the Warren Bank in return for the city's low interest deposits on which the bank earned high interest. Marrocco asserts that a bank officer funded one-third of Dannis' election campaign to influence her judgment as a public official.

On November 9, 1981, the Monday after Randlett was elected mayor, Randlett asked Marrocco to leave his position as city attorney. Randlett said that he realized that Marrocco, expecting to leave after the election, had already sought civil service reinstatement to his former position, but Randlett then stated that he did not recognize the reinstatement and that Marrocco's services would no longer be required in any capacity in the city attorney's office. Marrocco said that he desired to stay at least until the following June so that his pension would vest and that the mayor's actions would compel him to bring an action in circuit court. Thomas Barwin, the mayor's assistant, said that they would ruin his reputation or ruin him if he did. Marrocco gathered his things and left his office that day. Also, either that Monday or the prior Friday, Dannis told Marrocco: "I believe you're the most honest City Attorney this City

ever had, but I want you to pack your pencils and get out of town." From November 9, 1981, until Marrocco's ultimate reinstatement in 1983, he was deprived of the opportunity to work as an assistant city attorney in Warren.

Marrocco pursued administrative remedies in January and February, 1982, in an effort to be reinstated. The Civil Service Board had earlier reinstated him as an assistant city attorney. However, Randlett replaced at least two members of the board, and, after reconsidering the issue, it declined to take any action regarding Marrocco's reinstatement.

Marrocco then commenced a civil action, pursuing this course from February to April, 1982. In April, the circuit court ordered Marrocco reinstated as an assistant city attorney. On the first day he reported for work, however, city attorney David Griem, Marrocco's successor, told him that the mayor's office was pressuring Griem to fire him. Marrocco states that Griem told him he would note that Marrocco reported for work, but that he should leave because the mayor and Barwin were going to have him thrown out. Marrocco left and that month accepted a position in the Macomb County Prosecutor's office. He informed his supervisor at his new job that he would return to his Warren job when able to do so.

Within three weeks of Marrocco's April, 1982, start at the prosecutor's office, two supervisors, Paris and Lord, told Marrocco that both Randlett and Dannis were pressuring them to fire him. Griem also told Marrocco that he knew Randlett and Dannis had contacted Paris' office. After two months' work, Marrocco resigned his position handling paternity cases—which Marrocco says he was told was a "back shelf position where nobody

can get you"—primarily because he was aware of what his presence might be doing to Paris' career.

In the ensuing months, Griem's refusal to fire Marrocco for cause, his request that Randlett put in writing his instruction to do so, and his continuing to pursue the lawsuit that was the subject of *City of Warren v Dannis,* despite pressure from Randlett not to, led to Griem's resignation in September or October, 1982.

Marrocco experienced further harassment. He sought to enter Warren City Hall a number of times before and after his court-ordered reinstatement as an assistant city attorney. In May or June, 1983, Marrocco entered city hall on crutches after an accident. He perused campaign paraphernalia for Randlett's reelection on a table outside the mayor's office and made a tongue-in-cheek remark about the "mayor cleaning up corruption." Barwin told him to remove himself or be thrown out. Marrocco also states that persons in and out of city hall were afraid to talk to him. At one point he sought to aid assistant city attorney Servitto with a motion in a case and learned that Randlett threatened Servitto with dismissal if Servitto accepted Marrocco's aid. Servitto was later fired.

Marrocco also alleges that Dannis harassed him by raising the tax assessment on his house so he could not afford it and had to sell, and that subsequently the assessment was reduced.

II

In *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567, 592; 363 NW2d 641 (1984), this Court stated:

Judges, legislators, and the highest executive

officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their respective judicial, legislative, and executive authority.[4]

The parties concede that Randlett and Dannis are among the highest elective officials of Warren government. The question presented is thus whether there is a genuine issue of material fact whether defendants acted "within their . . . executive authority."[5]

No decision of this Court defines "within their . . . executive authority." In *Smith v Dep't of Public Health,* 428 Mich 540, 544, 611; 410 NW2d 749 (1987), this Court said that there was no " 'intentional tort' exception to governmental immunity" and thus intentional torts are immune if committed within the scope of a governmental function. It was emphasized, however, that "the intentional use or misuse of a badge of governmen-

---

[4] The Court continued:

Lower level officers, employees, and agents are immune from tort liability only when they are

a) acting during the course of their employment and are acting, or reasonably believe they are acting, within the scope of their authority;
b) acting in good faith; and
c) performing discretionary-decisional, as opposed to ministerial-operational, acts.

"Discretionary-decisional" acts are those which involve significant decision-making that entails personal deliberation, decision, and judgment. "Ministerial-operational" acts involve the execution or implementation of a decision and entail only minor decision-making. [*Id.*]

We need not examine whether the alleged acts are discretionary-decisional or ministerial-operational. "Within . . . executive authority" refers to all authorized acts—both discretionary-decisional and ministerial-operational—and an official is subject to liability for discretionary-decisional acts not "within [his] executive authority."

[5] *Id.* at 592.

tal authority for a purpose unauthorized by law is not the exercise of a governmental function."[6]

*Ross* establishes a framework for analysis in its methodology for answering the analogous question whether acts of lower level officials or governmental units are "governmental functions." The analysis is to look at the statutes (ordinances) to determine whether the act is in an area in which the governmental unit is authorized to function.[7] The analogous approach in the instant case would be to examine the powers of the offices of mayor and treasurer.[8]

Plaintiff refers to sections of the Code of Ordinances of the City of Warren defining the duties of

---

[6] In *Harlow v Fitzgerald,* 457 US 800, 818-819; 102 S Ct 2727; 73 L Ed 2d 396 (1982), the United States Supreme Court held that federal "government officials performing discretionary functions" are not absolutely immune from personal liability, but they are generally shielded by a "qualified immunity" that protects them "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

[7] This Court held:

[A] governmental function is an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law. . . . Whenever a governmental agency engages in an activity which is not expressly or impliedly mandated or authorized by constitution, statute, or other law (i.e., an *ultra vires* activity), it is not engaging in the exercise or discharge of a governmental function. The agency is therefore liable for any injuries or damages incurred as a result of its tortious conduct. [*Id.* at 620.]

See also *Hyde v Univ of Michigan Bd of Regents,* 426 Mich 223, 243; 393 NW2d 847 (1986).

[8] This is the approach employed by the Washington Supreme Court:

This court adheres to the rule that officers of municipalities have only such powers and duties as are conferred upon them expressly or by necessary implication in the applicable statutes. [*State v O'Connell,* 83 Wash 2d 797, 824; 523 P2d 872 (1974). Citation omitted.]

the mayor and treasurer.[9] The Warren Code out-
lines but does not specifically enumerate their
responsibilities. Upon examination of other chap-
ters, however, it is possible to say that some acts
are not within their executive authority.

Marrocco alleges that he was granted a leave of
absence from his civil service position of assistant
city attorney by the Civil Service Board when he
was appointed Warren city attorney and that upon
leaving that position he was entitled to and did
receive reinstatement as an assistant city attor-
ney. He alleges that Randlett interfered with his
reinstatement. If Marrocco had the right to rein-
statement, the mayor most likely had no right to
interfere with Marrocco's return to the position of
assistant city attorney.

The Warren Code provides that the position of
city attorney is exempt from the operation of the
civil service system, and that the city attorney
"shall serve at the will of the appointing author-
ity."[10] The code provides:

> [I]f any city employee shall be appointed to any
> position exempted by this article [such as city
> attorney], *such employee shall,* upon written appli-
> cation therefor, *receive a leave of absence* for the
> period of time that such employee shall serve in
> such exempted position *and such city employees*
> who have been appointed *shall,* upon discontinu-
> ance of employment in such exempted position, *be
> reinstated* to the employment and duties classifica-
> tion held by such person at the time of acceptance
> of such exempted position.[11] [Emphasis added.]

It thus appears that Marrocco, as assistant city
attorney, was entitled to obtain a leave of absence

---

[9] Sections 7.3 and 7.12 of the Charter of the City of Warren.

[10] Warren Code, § 25-23(a).

[11] Warren Code, § 25-23(b).

during his service as city attorney and to reinstatement as assistant city attorney upon completing his duties as city attorney. Assuming that the mayor had the authority to hire and fire the city attorney, he nevertheless had no authority to interfere with a city attorney's resumption of employment as an assistant city attorney, a civil service position not subject to the mayor's appointive power.

While the mayor may appoint and remove Civil Service Board members,[12] that does not authorize him to interfere with the leave of absence and reinstatement process described in the Warren Code.[13] Such interference would not be "within [his] executive authority," and Randlett would not be entitled to the defense of immunity.

The mayor allegedly sought to have Marrocco fired from the Macomb County Prosecutor's office. It is questionable whether such an act is within the mayor's executive authority.

Turning to Marrocco's allegation that Dannis improperly raised the tax assessment on Marrocco's home so that he was forced to sell it, and that thereafter Dannis reduced the assessment, it is questionable whether those acts were within her authority.

Because we address these issues without benefit of factual development, we limit ourselves to the three alleged acts discussed. This does not, however, preclude a finding that other acts of Randlett or Dannis were not within their executive authority.

III

We hold that the highest executive officials of

_____

[12] Warren Code, §§ 25-37 and 25-41.

[13] Warren Code, § 25-23(b).

local government are not immune from tort liability for acts not within their executive authority. The determination whether particular acts are within their authority depends on a number of factors, including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official's authority, and the structure and allocation of powers in the particular level of government. It is not our intention now to rule with specificity concerning the authority of officials under the Warren Code. The trial court is the proper forum for an initial determination.

The decision of the Court of Appeals is reversed, and the cause is remanded to the trial court for proceedings consistent with this opinion.

RILEY, C.J., and BRICKLEY, ARCHER, and GRIFFIN, JJ., concurred with LEVIN, J.

BOYLE, J. (concurring). In *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 633; 363 NW2d 641 (1984), this Court apparently held that the highest elected officials of all levels of government are absolutely immune when they are acting within their authority. In fact, however, no high level elected official was a party in *Ross.*

Building upon *Ross, Smith v Dep't of Public Health,* 428 Mich 540, 611; 410 NW2d 749 (1987), apparently held that intentional torts are immune if committed within the scope of a governmental function, but that the intentional misuse of a badge of governmental authority for a purpose unauthorized by law is not the exercise of a governmental function and therefore not immune. However, in *Smith,* there were no individual defendants, elected or appointed.

Our order granting leave to appeal in this case assumed the precedential value of the *Ross* standard and therefore limited the issue to the application of *Ross* to these facts. Unfortunately, the majority opinion appears to assume the precedential value of *Ross* and *Smith* in reasoning that the tortious nature of these defendants' acts may carry them outside of the authority of these officials and thereby outside of the scope of their immunity.

Our continuing responsibility for policy formulation in the area of officer and employee immunity is set forth in 1986 PA 175, MCL 691.1407(3); MSA 3.996(107)(3), which provides that the new, statutory "gross negligence" standard shall not be construed as altering the law of intentional torts as it existed prior to the effective date of the amendment. See *McCann v Michigan,* 398 Mich 65; 247 NW2d 521 (1976); *Lockaby v Wayne Co,* 406 Mich 65; 276 NW2d 1 (1979).

I would prefer that common law in the area of governmental immunity be developed in a systematic case law fashion on the bases of actual records in specific cases. Instead, I perceive a process in which dictum is balanced upon dictum, and when the issue is actually presented, there is scarcely a record in which to explore the ramifications of the ruling. The law of governmental authority is too important to both plaintiffs and governmental defendants to be developed in this fashion.

Nevertheless, recognizing the limitations of our order granting leave to appeal in this case, I would concur in the result of the majority, remanding this matter to the circuit court. In my view, at least insofar as the mayor is alleged to have sought to have the plaintiff fired from the Macomb County Prosecutor's office, it is questionable whether there is immunity under the *Ross* stan-

dard. However, in so concluding, I do not wish to be understood as discouraging arguments as to whether we should delimit or affirm the dictum in *Ross* regarding absolute immunity or as to the wisdom or lack thereof of reintroducing concepts that define governmental function by reference to an actor's intent. I am assuming that the nature of our order granting leave in this matter renders the case sui generis.

CAVANAGH, J., concurred with BOYLE, J.