Mary Beth Kelly, J.
This case concerns “absolute” governmental immunity. Specifically, we consider whether a village chief of police, the highest appointive executive official of a level of government, acted within the scope of his “executive authority” when he performed the duties of an ordinary police officer and is, therefore, entitled to absolute immunity under MCL 691.1407(5) of the governmental tort liability act (GTLA), MCL 691.1401 et seq. We hold that the term *194 “executive authority,” as used in MCL 691.1407(5), encompasses all authority vested in the highest executive official by virtue of his or her role in the executive branch, including the authority to engage in tasks that might also be performed by lower-level employees. Consistent with the plain meaning of “executive authority,” the highest executive official is entitled to absolute immunity under MCL 691.1407(5) even when performing acts that might otherwise be performed by a lower-level employee if those actions fall within the authority vested in the official by virtue of his or her role as an executive official. Because no factual dispute exists in this case with regard to whether the village chief of police had the authority to conduct an arrest in his official capacity as chief of police, we hold that the chief of police is absolutely immune from tort liability arising from his arrest of the citizen in this case. The Court of Appeals reached a contrary conclusion and, accordingly, we reverse the judgment of the Court of Appeals and remand this matter to the circuit court for entry of summary disposition in favor of village of Port Sanilac Chief of Police Rodney Jaskowski with regard to the claims against him and for further proceedings not inconsistent with this opinion.
I. FACTS AND PROCEDURAL HISTORY
On July 19, 2008, the village of Port Sanilac held its annual “Bark Shanty Festival,” an outdoor summer fundraising event involving a beer tent and several musical acts. The band HI8US was among the acts scheduled to perform. Before HI8US’s scheduled performance, volunteers working at the beer tent received numerous complaints about the allegedly offensive music. Ron Smith, the Brown City Police Chief, reported to the park after volunteers at the beer tent relayed to him *195 the complaints about the offensive music. The organizer of the musical portion of the event also returned to the park after receiving a call informing her that festival patrons were displeased with the music.
When Smith arrived at the park, he heard individuals in the beer tent heckling the band then onstage. He also saw attendees, including families, leaving the festival, some of whom voiced their displeasure with the musical performances as they left. Several individuals also complained to Smith that they found the bands’ music “offensive, disturbing, and not appropriate for the crowd.” The Village of Port Sanilac Fire Chief, who was involved with beer tent operations, indicated he would close the beer tent if the bands’ music continued to drive patrons away. He also warned Smith that he anticipated trouble arising between the bands’ supporters and other festival attendees. Concerned about the festival’s atmosphere, Smith contacted Jaskowski to report the potential trouble. After speaking with Smith, Jaskowski went to the park and agreed with the decision to stop the bands’ performances.
Thomas Petipren, a drummer for HI8US, claims that he did not know that organizers decided to cancel the remaining musical performances and was onstage playing his normal warm-up routine when Jaskowski approached him. Petipren noticed Jaskowski appeared angry, so he stopped playing and held his drumsticks in his lap. He claimed he said nothing and simply waited to find out what Jaskowski wanted. Jaskowski then allegedly knocked over Petipren’s equipment, grabbed and threw Petipren’s drumsticks to the ground, and assaulted him, grabbing Petipren by the collar and pushing him off his seat and into a pole. Petipren claims he put his arms up and asked, “What did I do?” Jaskowski then allegedly pushed him off the stage and down onto *196 the grass, yelling at Petipren to stop resisting. Once Petipren was face down, Jaskowski handcuffed him. When a bystander asked why Petipren was being arrested, Jaskowski had him arrested as well.
In contrast to Petipren’s version of events, Jas-kowski insists that he told Petipren to stop playing, to which Petipren responded by swearing at him and punching him in the jaw. Jaskowski then arrested Petipren. Jaskowski maintains that Petipren continued to resist while he was placed in handcuffs. Jaskowski arrested Petipren for resisting and obstructing a police officer, assaulting a police officer, and disorderly conduct, but the prosecutor ultimately declined to press any charges.
Following the incident, Petipren filed suit against the village of Port Sanilac[1] and Jaskowski, individually and in his capacity as the chief of police.[2] Petipren alleged assault and battery and false arrest. Several months later, Jaskowski filed a separate suit against Petipren, claiming assault and battery, intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress.[3] Petipren, in turn, counterclaimed against Jaskowski, alleging intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress.
Jaskowski moved for summary disposition under MCR 2.116(C)(7) in Petipren’s original suit, and, at a later date, under MCR 2.116(C)(7), (8), and (10) in regard to Petipren’s counterclaims. In both cases, Jas- *197 kowski asserted that he was absolutely immune under MCL 691.1407(5) of the GTLA because, in executing the arrest, he acted within his executive authority as the highest appointed executive official of a level of government.[4] To establish his claim, Jaskowski provided the circuit court with the job description for the village of Port Sanilac chief of police and an affidavit in which he attested to his occupational duties. The job description includes a list of “ESSENTIAL DUTIES AND RESPONSIBILITIES” and identifies the “FUNCTIONAL RESPONSIBILITIES” of the police department, the latter of which include “[mjaintenance of law and order in the Village of Port Sanilac” and “[t]he enforcement of all laws of the United States, the State of Michigan, and all ordinance of such law, and ordinances of the Village of Port Sanilac.”[5]
[6]The functional responsibilities identified in the job description also included
[p]atrol[ing] the streets of the Village of Port Sanilac,... and in doing so observing] and investigating] persons, situations or things which require attention and which affect enforcement of laws or prevention of crime. Preserving] the peace and protecting] life and property, controlling] public gatherings and performing] miscellaneous services relative to public health and safety including property checks.... Receiving] and processing] com *198 plaints by citizens, arresting] offenders, preparing] reports and testifying] in court.[6]
Petipren opposed the motions for summary disposition, arguing that Jaskowski was not the highest executive of a level of government and that Jaskowski had acted with an improper motive, arresting Petipren because Jaskowski was prejudiced against Petipren and his fans. The circuit court denied Jaskowski’s motion for summary disposition in Petipren’s original suit, concluding that because Jaskowski had acted with a biased motive, he had not acted within his executive authority as chief of police. On the record, the circuit court explained, “I don’t think it’s acting in a Governmental function, I don’t think it’s within the scope of authority of a Police Chief. I think it’s a personal vendetta, someone who thinks there’s a Music Fair apparently and therefore immunity is not available to Rodney Jaskowski. That motion is denied.” The circuit court also denied Jas-kowski’s claim of absolute immunity in regard to Peti-pren’s counterclaims in the second lawsuit.[6]
[7]
Jaskowski appealed each case as of right, disputing the circuit court’s application of governmental immu *199 nity. The Court of Appeals consolidated the appeals and, in a split, published opinion, affirmed, holding that “[w]hen a police chief acts as an ordinary police officer — that is, when the nature of the act is outside the scope of his or her executive duties — the chief is not entitled to absolute immunity simply because he or she is also the police chief.”[8] After noting that no binding Michigan case had considered whether a police chief is entitled to absolute immunity when he or she undertakes actions performed by ordinary police officers, the Court of Appeals construed the words “executive authority,” as used in MCL 691.1407(5), to mean only those “ ‘tasks particular to [the official’s] position as the “highest appointive official.” ’ ”[9] According to the Court of Appeals, this interpretation, which it adopted from a federal district court decision, “best reflects the legislative intent expressed in the words of [the statute].”[10] The Court of Appeals explained:
Although a police chief may occasionally perform the duties of an ordinary police officer, the police chief is not acting within the scope of his or her executive authority as the highest executive official in the police department when doing so. Rather, the nature of the act is that of an *200 ordinary police officer. As an ordinary police officer, he would be entitled to the immunity provided to governmental employees under MCL 691.1407(2) if all the statutory requirements were satisfied. Indeed, it would lead to an illogical result to limit a plaintiffs intentional-tort claims arising from the conduct of a police officer in those cases in which the police officer was also the police chief who was acting as an ordinary police officer at the time he or she allegedly committed the tortious act.[11]
Given its understanding of the term “executive authority,” the Court of Appeals applied the factors relevant to determining the scope of the actor’s executive authority, articulated by this Court in American Transmissions, Inc v Attorney General,[12] by considering only that evidence related to Jaskowski’s high-level duties, as outlined in the essential-duties section of the police chiefs job description.[13] Because those duties “generally involve policy, procedure, administration, and personnel matters,” the Court of Appeals concluded that Jas-kowski was not acting within his executive authority when he arrested Petipren and that Jaskowski was, therefore, not entitled to absolute immunity under MCL 691.1407(5).[14]
*201 We granted leave to appeal, “limited to the issue whether Chief of Police Jaskowski is entitled to absolute immunity under MCL 691.1407(5).”[15]
II. STANDARD OF REVIEW
This Court reviews de novo a circuit court’s decision regarding a motion for summary disposition.[16] When a claim is barred by governmental immunity, summary disposition is appropriate under MCR 2.116(C)(7).[17] Under MCR 2.116(C)(7), the moving party has the option of supporting its motion with affidavits, depositions, admissions, or other documentary evidence provided that the “substance or content” of the supporting proofs is admissible as evidence.[18] In reviewing a motion under MCR 2.116(C)(7), we accept the factual contents of the complaint as true unless contradicted by the movant’s documentation.[19] When the material facts are not in dispute, this Court may decide whether a plaintiffs claim is barred by immunity as a matter of law.[20]
This case requires us to interpret MCL 691.1407(5), raising an issue of statutory interpretation that this Court reviews de novo.[21] When construing a statute, this Court’s obligation is to discern the Legislature’s intent as expressed in the statute’s plain language.[22] If *202 the language is clear and unambiguous, the statute must be enforced as written without judicial construction.[23]
III. ANALYSIS
Before the Michigan Legislature’s enactment of the GTLA, this Court’s jurisprudence recognized the existence of governmental immunity for all levels of government, including townships, cities, school districts, villages, and counties when those subdivisions were engaged in a governmental function.[24] Our common law has also long recognized that certain individuals may enjoy immunity from tort liability, historically granting immunity to governmental “officers, employees, and agents . .. engaged in discretionary, as opposed to ministerial, acts which were within the scope of their authority.”[25] Over time, however, our caselaw muddled the parameters of individual immunity by defining it with references to ultra vires acts and whether an individual was engaged in the exercise of a governmental function.[26]
*203 We thus endeavored to clarify the common law of individual immunity in Ross v Consumers Power Co (On Rehearing), in which we distinguished between the immunity available to lower-level employees and high-ranking officials. We modified the ultra vires approach for lower-level employees and required them to show that they were not only (1) acting during the course of their employment and acting or reasonably believed they were acting, within the scope of their authority; but also that they were (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts.[27] In comparison, we identified certain high-ranking officials entitled to a broader grant of immunity, holding that “judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their judicial, legislative, or executive authority.”[28] We thus retained an approach similar to the ultra vires approach for high-ranking officials, providing absolute immunity whenever high-ranking officials acted within the scope of their respective authority.[29] Then, two years after Ross, the Legislature amended the GTLA, as it relates to the present dispute, by codifying Ross’s grant of absolute immunity at MCL 691.1407(5).[30]
*204 With this historical context in mind, we turn to the language of MCL 691.1407(5), which provides certain high-ranking officials with absolute immunity from tort liability, to determine whether Jaskowski is entitled to absolute immunity. It states:
A judge, a legislator, and the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority.
To qualify for absolute immunity from tort liability an individual governmental employee must prove his or her entitlement to immunity by establishing, consistently with the statute’s plain language, (1) that he or she is a judge, legislator, or the elective or highest appointive executive official of a level of government and (2) that he or she acted within the scope of his or her judicial, legislative, or executive authority.[31] In the circuit court, Petipren argued that Jaskowski was not the highest appointive executive official of a level of government.[32] On appeal, Petipren abandoned this ar *205 gument, leaving the sole issue before this Court as whether Jaskowski acted within the scope of his executive authority when he arrested Petipren. To determine whether Jaskowski qualifies for absolute immunity under MCL 691.1407(5) when performing the duties of an ordinary police officer while serving as the highest appointive executive official of the village, we examine the meaning of “executive authority” as interpreted in this state’s jurisprudence.
A. EXECUTIVE AUTHORITY
Petipren, like the Court of Appeals, asserts that Jaskowski engaged in activities outside the scope of his executive authority when he arrested Petipren and is therefore not entitled to absolute immunity. As the Court of Appeals acknowledged, no decision of this Court has specifically considered whether the scope of a police chiefs executive authority under MCL 691.1407(5) may include those activities also performed by ordinary officers.[33] Further, the GTLA does not define what it means to “act[] within the scope of his or her ... executive authority,” nor has this Court expressly defined the parameters of the phrase. However, we have previously identified several factors as relevant to the determination whether an action is within the scope of an executive official’s authority. Specifically, we recognized in American Transmissions that
*206 “[t]he determination whether particular acts are within their [executive] authority depends on a number of factors, including the nature of the specific acts alleged, the position held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official’s authority, and the structure and allocation of powers in the particular level of government."[34]
This list of factors, while not exhaustive, demonstrates the type of objective inquiry into the factual context that is necessary to determine the scope of the actor’s executive authority.[36] This objective inquiry does not include analysis of the actor’s subjective state of mind.[36] An official’s motive or intent has no bearing on the scope of his or her executive authority.[37]
While the factors outlined in American Transmissions remain relevant to the determination whether certain acts are within the scope of an executive’s authority, they do not resolve the definitional issue regarding whether the Legislature intended “executive authority” to include activities also performed by lower-level officials or, as the Court of Appeals held, to include only duties exclusive to the elective or highest appointive executive official’s position. To resolve this issue, we turn to the statute’s plain language.
Again, MCL 691.1407(5) provides that, to claim absolute immunity, the highest appointive executive official must “act[] within the scope of his or her. . . *207 executive authority.” We begin our analysis of the phrase “executive authority” by examining the term’s plain and ordinary meaning.[38] “Authority” is defined as “a power or right delegated or given,” and “scope” is defined as the “extent or range of view, outlook, application, operation, effectiveness . . . .”[39] Taken together, the words indicate that a highest appointive executive official’s scope of authority consists of the extent or range of his or her delegated executive power.
In determining what the Legislature intended by the use of the term “executive,” we are mindful of the principle that statutory words are to be “given meaning by [their] context or setting.”[40] In context, the words “executive authority” appear as the counterpart to the statute’s reference to “judicial” and “legislative” authority. Specifically, the statute grants immunity to certain high-level officials when they act within the scope of their “judicial, legislative, or executive authority.” Because the words are grouped together in a list, we assume those words were intended to have a related meaning.[41] By using the term “executive” in conjunction with the terms “judicial” and “legislative,” the Legislature plainly referred to the axiomatic power division among the three branches of government— *208 legislative, executive, and judicial.[42] This reference to the three branches of government parallels the statute’s earlier description of who may claim absolute immunity, namely: “[a] judge, a legislator, and the elective or highest appointive executive official of all levels of government. ...” In both instances, the term “executive” appears in MCL 691.1407(5) as a reference to the executive branch of government, thereby referring to the authority exercised by individuals in that branch of government. In a similar fashion, the statute envisions a legislator’s exercise of legislative authority and a judge’s exercise of judicial authority. Nowhere does the statute contain any indication that the “executive authority” exercised must be exclusive to the elective or highest appointive official in order for that official to claim absolute immunity.
We therefore hold that “executive authority” as used in MCL 691.1407(5) means all authority vested in the highest executive official by virtue of his or her position in the executive branch. In so concluding, we reject other possible interpretations of the term “executive,” including the notion proposed by the Court of Appeals, Petipren, and the dissent that it should be read as referring to high-level administrative or supervisory functions particular to an executive’s office. That interpretation ignores the context in which the term “executive” is used. In context, the term “executive authority” *209 does not contemplate whether the highest appointive executive official performed high-level duties exclusive to his or her position, but simply whether the official exercised authority vested in the official by virtue of his or her role in the executive branch.[43]
In reaching the contrary conclusion, the Court of Appeals failed to undertake any explication of the statute’s plain language and relied instead on a federal district court decision, Scozzari v City of Clare.[44] In that case, a city police chief sought absolute immunity under MCL 691.1407(5) from numerous tort claims resulting from a shooting death that had occurred when the chief attempted to arrest the decedent. The federal court rejected the police chiefs claim of absolute immunity, reasoning that “[t]he Chief does not address the fact that he appears to have been acting in his capacity as an officer on patrol, rather than performing any tasks particular to his position as the ‘highest appointive official.’ ”[45] In our view, Scozzari is devoid of any persuasive value: the court engaged in no statutory analysis and simply dismissed the police chiefs assertion of absolute immunity in light of his failure to address the implications of the fact that he had acted as an ordinary officer.[46] Further, the implicit holding of *210 Scozzari, that absolute immunity is only available when an official performs acts unique to his or her position as the highest executive official, is detached from the plain language of the statute, as we have previously explained. In any case, Scozzari is a decision of a lower federal court, and we are not bound to follow it.[47]
The Court of Appeals also erroneously justified its holding on the basis of what it perceived as an “illogical result.” According to the Court of Appeals, it would be illogical to confer absolute immunity on a police chief who was acting as an ordinary officer because an ordinary officer engaged in the same conduct would be entitled only to the qualified immunity offered by MCL 691.1407(2) or, in the case of an intentional tort, the common-law immunity described in Ross.[48] Yet this outcome is exactly what the Legislature intended when it distinguished between the absolute immunity avail *211 able to those actors at the highest levels of government and the lesser immunity available to those actors who are lower-level employees.[49] While it is true that lower-level actors and high-ranking officials may possess some overlapping authority and, at times, engage in the same governmental conduct, MCL 691.1407(5) includes no indication that the absolute immunity granted to high-ranking officials is not absolute when their authority encompasses conduct that might also be performed by a lower-level employee. To adopt the Court of Appeals’ understanding of executive authority would eviscerate the Legislature’s clear intent to completely insulate individuals at the highest levels of government from tort liability when they are acting within the scope of their official authority. While the Court of Appeals *212 viewed this result as illogical, the propriety of the Legislature’s decision to treat individuals differently on the basis of their official positions is a question of policy for the Legislature, not this Court.[50]
Accordingly, the Court of Appeals erred when it interpreted “executive authority” to include only those high-level tasks exclusive to the official’s position. Rather, we hold, consistent with the plain meaning of “executive authority,” that the highest appointive executive official is entitled to absolute immunity under MCL 691.1407(5) even when performing the acts of a lower-level employee if those actions are within the authority vested in the official by virtue of his or her role as an executive official.
B. APPLICATION
Our analysis does not end with our determination that the term “executive authority” in MCL 691.1407(5) refers to all those powers vested in the highest executive official by virtue of his or her role as an executive official, which may also include those functions performed by lower-level employees. Because the specific acts alleged involve Jaskowski’s arrest of Petipren, we consider whether Jaskowski’s executive authority actually included the ability to conduct an arrest. This inquiry requires consideration of the factors articulated in American Transmissions, including “ ‘the nature of the specific acts alleged, the position *213 held by the official alleged to have performed the acts, the charter, ordinances, or other local law defining the official’s authority, and the structure and allocation of powers in the particular level of government.’ ”[51]
In this case, there is no factual dispute regarding the duties Jaskowski’s position required him to perform or that, by virtue of his position as chief of police, Jas-kowski was also a police officer, meaning that he possessed the power of any ordinary officer to conduct an arrest.[52] By statute, village police officers are vested “with authority necessary for the preservation of quiet and good order in the village.”[53] As officers charged with the preservation of public peace, village police officers possess statutory authority to conduct an arrest.[54] As chief of police, Jaskowski was also charged with the duty to “see that all the ordinances and regulations of *214 the council, made for the preservation of quiet, and good order, and the protection of persons and property, are promptly enforced.”[55]
In addition to this statutory authority to conduct an arrest, Jaskowski presented to the circuit court his job description, as provided to him by the Port Sanilac Village Council, detailing his duties and responsibilities. Of particular relevance are the sections of the job description describing the functional responsibilities of the police department, which include “[mjaintenance of law and order in the Village of Port Sanilac” and “[t]he enforcement of all laws of the United States, the State of Michigan, and all ordinance of such law, and ordinances of the Village of Port Sanilac.” Most significantly, these responsibilities also include a duty to “[pjreserve the peace . . ., control public gatherings,” “[rjeceive and process complaints by citizens,” and “arrest offenders . .. .”[56]
Similarly, in an undisputed affidavit, Jaskowski quotes the job description and avers that his duties included patrolling the streets of the village and doing the following in the course of his patrolling:
“[olbserve and investigate persons, situations or things which require attention and which affect enforcement of laws or prevention of crime. Preserve the peace and protect *215 life and property, control public gatherings and perform miscellaneous services relative to public health and safety including property checks.... Receive and process complaints by citizens, arrest offenders, prepare reports and testify in court.”[57]
Taking this evidence as a whole, there is no genuine issue of material fact with regard to whether Jaskowski possessed the authority to conduct an arrest and act for the preservation of peace in his official capacity as chief of police. Where, as here, the highest appointive executive official acts within the authority vested in the official by virtue of his or her executive position and there are no questions of material fact, that official is entitled to absolute immunity as a matter of law.
The Court of Appeals erroneously affirmed the circuit court’s denial of summary disposition when it incorrectly construed the term “executive authority” as including only high-level tasks exclusive to an executive’s position. The Court of Appeals thereby disregarded all the evidence relevant to this inquiry, except for the essential duties listed in the job description for the position of chief of police. However, for reasons we have explained, there is no basis in the language of MCL 691.1407(5) for concluding that the highest executive official acts outside the scope of his or her executive authority when undertaking a task performed by lower-level employees, which is also undisputedly a task he or she is authorized to perform. That those activities might also be undertaken by lower-level employees does not alter the analysis for determining the scope of an official’s executive authority.
The circuit court’s reason for denying summary disposition — that Jaskowski acted with personal animus — is also erroneous. Petipren implicitly resur *216 rects this argument on appeal by offering extensive discussion of the circumstances surrounding his arrest, but as we have made clear, an actor’s intent and motivation have no bearing on the scope of his or her executive authority under MCL 691.1407(5).[58] In sum, because the power to arrest unquestionably falls within the scope of Jaskowski’s executive authority under MCL 691.1407(5), as a matter of law, Jaskowski is absolutely immune from tort liability stemming from Petipren’s arrest, and the lower courts erred by denying Jaskowski’s motions for summary disposition.
IV RESPONSE TO THE DISSENT
The dissent’s main concern with our holding is that it “remov[es]” the statutory language from its context and returns Michigan’s approach to individual absolute immunity to an “ultra vires” test that grants immunity based on the official’s high-level status. However, in formulating its preferred holding, that the absolute immunity provided for under MCL 691.1407(5) is limited to “a specific subset of authority,” the dissent reads “executive authority” in a manner isolated from the context in which it is used. By focusing only on the terms that directly modify the word “authority,” the dissent ignores the necessary parallel between the official’s position and his or her judicial, legislative, or executive authority and thereby fails to afford meaning to every word in the statute. Further, by overlooking the term “executive” as a clear reference to the authority exercised by those in the executive branch of government and instead defining it as a specific subset of high-level duties related to “administrative or managerial responsibilities],” the dissent reads additional requirements into the statute that do not exist. It is *217 therefore the dissent that has “transform[ed]” the grant of absolute immunity to something other than the official’s “executive authority” as intended by the Legislature.[59]
Similarly unpersuasive is the dissent’s complaint that our holding grants absolute immunity to high-level officials simply because they are “cloaked with the title of a high-level executive.” This accusation plainly oversimplifies our holding; any high-level executive official acting outside his or her executive authority, as we have defined it, is not entitled to absolute immunity. The dissent also protests that we have returned Michigan’s approach to individual absolute immunity to an “ultra vires” test, which according to the dissent “was rejected by Ross . . . and, subsequently, the Legislature ... .” However, a closer reading of Ross reveals that this Court merely criticized that approach and rejected it as to lower-level employees, not high-level judicial officers, legislators, and executive officials.[60] To the extent it can be said that the Legislature codified the absolute indi *218 vidual immunity articulated in Ross, it did not reject the ultra vires test. Indeed, given the plain language of MCL 691.1407(5), the Legislature’s codification of absolute immunity with regard to high-level officials is consistent with the ultra vires approach and is precisely necessary to protect high-level officers’ unfettered decision-making.[61]
In short, there is no support in the law for the dissent’s characterization of our holding as adopting a rule of individual absolute immunity that radically departs from the statutory language and that has supposedly been rejected by the Legislature. Rather, it is the dissent’s view that would depart from the statutory language and it is the dissent’s view that would adopt a test not recognized anywhere in Michigan law. Indeed, our review of the caselaw reveals no authority, aside from the Court of Appeals decision in this case, confining individual absolute immunity to a subset of high-level authority.
V CONCLUSION
The term “executive authority,” as used in MCL 691.1407(5), encompasses all authority vested in the highest appointive executive official of a level of govern *219 ment by virtue of his or her role in the executive branch, including the authority vested in the official to engage in tasks that might also be performed by lower-level employees. Under the statute’s plain terms, when the highest appointive executive official of a level of government acts within the scope of his or her executive authority, the official is entitled to absolute immunity. Because there is no genuine issue of material fact that Jaskowski’s executive authority encompassed the authority to preserve the peace and conduct an arrest, Jaskowski is absolutely immune under MCL 691.1407(5) from tort liability arising from Petipren’s arrest. For this reason, we reverse the Court of Appeals’ conclusion to the contrary and remand this matter to the circuit court for entry of judgment in favor of Jaskowski in Sanilac Circuit Court Docket No. 09-032990-NO, for entry of judgment in favor of Jas-kowski on Petipren’s counterclaims in Sanilac Circuit Court Docket No. 10-033374-NO, and for further proceedings not inconsistent with this opinion.
Young, C.J., and Zahra, J., concurred with Kelly J.

 The circuit court dismissed the claims against the village after determining that the village was immune from liability under MCL 691.1407(1), which provides immunity to governmental agencies engaged in governmental functions.

 Sanilac Circuit Court Docket No. 09-032990-NO.

 Sanilac Circuit Court Docket No. 10-033374-NO.

 In regard to Petipren’s negligence-based counterclaims, Jaskowski also asserted that he was entitled to the governmental immunity available to all officers and employees of governmental agencies under MCL 691.1407(2) because Petipren failed to allege gross negligence. See Odom v Wayne Co, 482 Mich 459, 479-480; 760 NW2d 217 (2008). Relying on Odom., Jaskowski also maintained that Petipren’s intentional-infliction-of-emotional-distress counterclaim must be dismissed because Jaskowski had acted in good faith, he acted or reasonably believed he was acting within the scope of his authority, and the arrest was discretionary in nature, thereby entitling him to the immunity available to lower-level employees under MCL 691.1407(2).

 Emphasis omitted.

 The job description’s essential duties and responsibilities involve employment decisions, administrative tasks, policy and procedural decisions, and the general authority to “[m]ake[] decisions and take[] necessary actions.”

 The circuit court likewise declined to dismiss Petipren’s intentional-infliction-of-emotional-distress counterclaim under MCR 2.116(0(10), finding an issue of fact remained concerning whether Jaskowski’s conduct could be characterized as “extreme and outrageous” and whether he acted in good faith as required by Odom. The circuit court dismissed Petipren’s negligence and negligent-infliction-of-emotional-distress counterclaims under MCR 2.116(C)(8), but it allowed Petipren to amend his countercomplaint to state a claim of gross negligence, which he did. As a result, the remaining claims to be resolved include Petipren’s claims of assault and battery and false arrest and his counterclaims for intentional infliction of emotional distress and gross negligence.

 Petipren v Jaskowski, 294 Mich App 419, 432; 812 NW2d 17 (2011) (emphasis added).

 Id. at 431, quoting Scozzari v City of Clare, 723 F Supp 2d 945, 967 (ED Mich, 2010). In adopting Scozzari’s interpretation of “executive authority,” the Court of Appeals rejected the reasoning of an unpublished Court of Appeals opinion, which held that “a police chiefs ‘executive authority’ includes his duties as a high ranking executive as well as his ordinary duties as a police officer.” Lewkowicz v Poe, unpublished opinion per curiam of the Court of Appeals, issued May 15, 2001 (Docket No. 216307), p 2. The panel of the Court of Appeals addressing this case determined that Lewkowicz was unpersuasive given that, in Lewkowicz, the police chief was directed to attend a city council meeting “in his official capacity as police chief....’’ Petipren, 294 Mich App at 431 (emphasis omitted).

 Id.

 Id. at 432-433.

 American Transmissions, Inc v Attorney General, 454 Mich 135, 141; 560 NW2d 50 (1997), quoting Marrocco v Randlett, 431 Mich 700, 710-711; 433 NW2d 68 (1988).

 Petipren, 294 Mich App at 427-429. The Court of Appeals recognized that the job description also included a section setting forth the functional responsibilities of the police department, which are equivalent to the duties of an ordinary police officer, and that Jaskowski submitted an affidavit stating that his duties included those functional responsibilities. However, the Court of Appeals dismissed the significance of this evidence because “the fact that Jaskowski performed those functions does not place the functions within the scope of the executive duty of the police chief; rather, they remain within the scope of the functional responsibilities of the police department generally.” Id. at 432 n 6.

 Id. at 429, 432-433.

 Petipren v Jaskowski, 491 Mich 913 (2012).

 Maiden v Rozwood, 461 Mich 109, 118; 597 NW2d 817 (1999).

 Glancy v City of Roseville, 457 Mich 580, 583; 577 NW2d 897 (1998).

 Maiden, 461 Mich at 119.

 Id.

 See Robinson v Detroit, 462 Mich 439, 445; 613 NW2d 307 (2000); see also Guider v Smith, 431 Mich 559, 572; 431 NW2d 810 (1988) (noting a case should proceed to trial if there is a question of fact that would affect the availability of immunity).

 Odom, 482 Mich at 467.

 Driver v Naini, 490 Mich 239, 246-247; 802 NW2d 311 (2011).

 Id. at 247.

 See Pohutski v City of Allen Park, 465 Mich 675, 682; 641 NW2d 219 (2002) (citation omitted); Ross v Consumers Power Co (On Rehearing), 420 Mich 567, 605, 695; 363 NW2d 641 (1984).

 Ross, 420 Mich at 626. Discretionary acts require “personal deliberation, decision, and judgment,” whereas ministerial acts constitute “an obedience to orders or the performance of a duty in which the individual has little or no choice.” Id. at 634. The distinction between the two is that “the former involves significant decision-making, while the latter involves the execution of a decision and might entail some minor decision-making.” Id. at 635.

 As we explained in Ross, “ultra vires activities are those which are unauthorized and outside the scope of employment.” Id. at 631. In Ross, we criticized the ultra vires approach because, under the state of the law at that time, the ultra vires approach granted immunity to every public employee acting within the scope of employment regardless of whether he or she was *203 engaged in a ministerial or discretionary act. In Ross, we also expressly disavowed the “governmental function” approach, which granted individual immunity if the individual’s actions were not ultra vires and were within the scope of the discharge of a governmental function. We explained that individual immunity could not be defined in reference to simply whether the tortfeasor was engaged in a governmental function. Id.

 Id. at 633-634.

 Id. at 633.

 In this regard, we disagree with the dissent’s characterization of Ross as rejecting the ultra vires approach to individual absolute immunity.

 See Odom, 482 Mich at 469 (explaining the legislative action post-Ross).

 MCL 691.1407(5); see also Marrocco, 431 Mich at 710-711 (recognizing that executive officials “are not immune from tort liability for acts not within their executive authority”); Odom, 482 Mich at 479 (recognizing that entitlement to governmental immunity must be established as an affirmative defense).

 Contrary to Petipren’s arguments in the circuit court, caselaw recognizes that a chief of police, as head of the police department, qualifies as the highest appointive executive official of a level of government. See, e.g., Payton v Detroit, 211 Mich App 375, 394; 536 NW2d 233 (1995) (“[W]hen acting in his executive authority, the police chief of the City of Detroit is absolutely immune from tort liability.”); Washington v Starke, 173 Mich App 230, 240-241; 433 NW2d 834 (1988) (holding that the highest executive in the city’s police department was entitled to absolute immunity); Meadows v Detroit, 164 Mich App 418, 427; 418 NW2d 100 (1987) (holding that the chief of police was absolutely immune from tort liability).

 Several decisions cited by the Court of Appeals considered whether conduct, such as supervisory decisions, employment decisions, and public comments, fell within a police chiefs executive authority. See Bennett v Detroit Police Chief, 274 Mich App 307, 313-315; 732 NW2d 164 (2007); Washington, 173 Mich App at 241; Meadows, 164 Mich App at 427. However, as the Court of Appeals acknowledged, none of these decisions considered whether executive authority includes actions that might also be performed by lower-level officers. For this reason, these cases do not directly address the issue presented in the current case.

 American Transmissions, 454 Mich at 141, quoting Marrocco, 431 Mich at 711.

 Id. at 143 n 10.

 Id. at 141-143 (recognizing that the Legislature did not provide a malevolent-heart exception to the grant of absolute immunity contained in MCL 691.1407(5) and rejecting a Court of Appeals decision that introduced concepts of intent and motive into the absolute-immunity context).

 See id.

 See Driver, 490 Mich at 246-247.

 Random House Webster’s College Dictionary (2001); see also Backus v Kauffman (On Rehearing), 238 Mich App 402, 409; 605 NW2d 690 (1999).

 Tyler v Livonia Pub Sch, 459 Mich 382, 390-391; 590 NW2d 560 (1999) (“Contextual understanding of statutes is generally grounded in the doctrine of noscitur a sociis: ‘[i]t is known from its associates!.]’ ”); see also Hamed v Wayne Co, 490 Mich 1, 8; 803 NW2d 237 (2011) (“We read the statutory language in context and as a whole, considering the plain and ordinary meaning of every word.”).

 Griffith v State Farm Mut Auto Ins Co, 472 Mich 521, 533; 697 NW2d 895 (2005), citing Third Nat’l Bank in Nashville v Impac Ltd, Inc, 432 US 312, 322; 97 S Ct 2307; 53 L Ed 2d 368 (1977).

 See Const 1963, art 3, § 2 (“The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.”); People v Salsbury, 134 Mich 537, 547-548; 96 NW 936 (1903) (“In government ‘executive’ is distinguished from ‘legislative’ and ‘judicial;’ ‘legislative’ being applied to the organ or organs of government which make the laws, ‘judicial’ to that which interprets and applies the laws, and ‘executive’ to that which carries them into effect.”) (citations and quotation marks omitted).

 Contrary to the dissent’s suggestion, in adopting this construction of the term “executive authority,” we do not discard the factors discussed in American Transmissions, 454 Mich at 141. Our holding today merely clarifies that conduct is not excluded from the scope of an official’s executive authority simply because it is not exclusive to the official’s position. Indeed, it is the dissent that effectively disregards these factors by advancing an interpretation that there is some “specific and limited subset” of “truly executive” authority.

 See Petipren, 294 Mich App at 431-432, discussing Scozzari, 723 F Supp 2d at 967.

 Scozzari, 723 F Supp 2d at 967.

 Id. In this regard, we agree with the Court of Appeals dissent’s criticism of the majority’s reliance on Scozzari, because, in the dissent’s *210 words, the “pivotal basis of the [Scozzari] court’s holding was that the defendant [unlike Jaskowski] failed to address whether his authority extended to those also exercised by a patrol officer.” Petipren, 294 Mich App at 436 n 3 (Murray, P.J., dissenting). In other words, Scozzari is readily distinguishable from the instant matter.

 Abela v Gen Motors Corp, 469 Mich 603, 607; 677 NW2d 325 (2004).

 Ross, 420 Mich 567. In Odom, this Court summarized the availability of immunity for lower-level employees. We explained that, in cases of negligence, to qualify for immunity under MCL 691.1407(2), the governmental employee must show:
(a) the individual was acting or reasonably believed that he was acting within the scope of his authority,
(b) the governmental agency was engaged in the exercise or discharge of a governmental function, and
(c) the individual’s conduct [did not] amountQ to gross negligence that was the proximate cause of the injury or damage. [Odom, 482 Mich at 479-480.]
In comparison, we recognized that immunity is available to lower-level employees against claims of an intentional tort if the employee can satisfy the common-law immunity described in Ross by showing the following:
*211 (a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority,
(b) the acts were undertaken in good faith, or were not undertaken with malice, and
(c) the acts were discretionary, as opposed to ministerial. [Id. at 480, discussing Ross, 420 Mich at 633-634.]

 The dissent effectively eviscerates these distinct levels of protection by reading MCL 691.1407(2) and MCL 691.1407(5) together to mean that high-level officials are merely entitled to qualified immunity if they are not acting within their limited subset of high-level authority. The dissent’s interpretation, however, is not supported by a reading of subsections (2) and (5) together, but rather hinges entirely on the premise that “executive authority” under subsection (5) includes only a subset of high-level duties. Once this premise is rejected, as it must be given the plain language of subsection (5), there is nothing in the language of either subsection (2) or subsection (5), singly or together, to indicate that a high-level official is entitled to only qualified immunity for conduct outside the supposed subset of high-level duties. Regarding this point, we disagree with the dissent’s suggestion that we have not given its interpretation a “faithful reading.” We have simply concluded that the dissent’s interpretation does not adhere to the plain language of the statute.

 See Robertson v DaimlerChrysler Corp, 465 Mich 732, 759; 641 NW2d 567 (2002) (“[The] judicial role precludes imposing different policy choices than those selected hy the Legislature ....”) (quotation marks and citation omitted); Gilliam v Hi-Temp Prod, Inc, 260 Mich App 98, 109; 677 NW2d 856 (2003) (“The fact that a statute appears to be impolitic, unwise, or unfair is not sufficient to permit judicial construction. The wisdom of a statute is for the determination of the Legislature and the law must be enforced as written.”).

 American Transmissions, 454 Mich at 141, quoting Marrocco, 431 Mich at 711. Notably, on the basis of its erroneous understanding of the term “executive authority,” the Court of Appeals wrongly disregarded all the evidence relevant to this inquiry except for the essential duties of Jaskowski’s job description.

 Petipren recognizes that Jaskowski is the chief of police, and he does not challenge the accuracy of the police chief job description or the veracity of Jaskowski’s affidavit describing his obligations as chief of police.

 MCL 70.14. They are similarly vested “within the village ... with all the powers conferred upon sheriffs for the preservation of quiet and good order ....” MCL 70.16.

 MCL 70.14 (authorizing village police to “suppress ... disturbances, and breaches of the peace,” and to “apprehend upon view any person found violating a state law or village ordinance in a manner involving a breach of the peace”); MCL 764.15(1) (describing the circumstances in which a “peace officer” may conduct an arrest without a warrant); see also People v Bissonette, 327 Mich 349, 356; 42 NW2d 113 (1950) (defining the term “peace officer” as generally including “sheriffs and their deputies, constables, marshals, members of the police force of cities, and other officers whose duty is to enforce and preserve the public peace”) (quotation marks and citation omitted).

 MCL 70.15.

 Emphasis added. The job description is rife with additional indications that in the village of Port Sanilac, the chief of police is expected to partake in those functions of a typical patrol officer. For example, the chief is expected to use guns, batons, handcuffs, police radios, Tasers, radar, and patrol car computers and aggressively operate a patrol car in emergencies. The job description also specifically advises that “physical intervention techniques may be necessary” and that the chief of police needs to be able to run and lift 300 pounds. The chief of police is also said to have a “[h]igh risk” of exposure to bloodborne pathogens, stemming from frequent and direct contact with individuals who might be carriers.

 Emphasis added.

 See American Transmissions, 454 Mich at 143-144.

 In further support of its interpretation, the dissent proposes that the Legislature’s codification of absolute immunity after our decision in Ross evinces a legislative intent to protect only a subset of high-level authority involving broad decision-making power. However, it is a fundamental principle of statutory interpretation that the Legislature speaks through the language used, Driver, 490 Mich at 246-247, and, as explained, the statutory language at issue does not protect only a subset of executive authority. Indeed, it is not our role to speculate whether the Legislature adopted the reasoning of the authorities that the Ross Court cited in support of its holding. Given the plain language of MCL 691.1407(5), it is thus irrelevant whether the members of the Ross Court intended that absolute immunity extend only to a subset of high-level decision-making authority. Therefore, the dissent’s reliance on Ross to support its interpretation of “executive authority” is misplaced.

 Although the dissent contends that Ross “rejected” the ultra vires approach, this assertion has not been supported with citation to an express statement to this effect from Ross. At most, Ross indicated that the ultra vires approach had “its drawbacks.” Ross, 420 Mich at 631.

 The dissent claims that our definition of “executive authority” as encompassing “all authority” “extends absolute immunity beyond its purpose ....” However, the unworkability of the dissent’s approach demonstrates exactly why the dissent’s interpretation would hinder “ ‘unfettered governmental decision-making,’ ” Ross, 420 Mich at 632 (citation omitted), and why our holding is entirely consistent with the purpose of absolute immunity. Mainly, to adopt the dissent’s definition of “executive authority” as including only a “specific subset of authority,” would place officials in the untenable position of continually attempting to discern which of their executive actions are somehow more executive than others so as to fall into the protected “subset” of executive authority. In the face of that uncertainty, high level officials would undoubtedly be constrained in their decision-making.